Circuit Court for Howard County
Case No. 13-C-15-103324

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 494

September Term, 2016

_____

VALERIE TRIM, *et al.*

v.

YMCA OF CENTRAL MARYLAND, INC.
_____

Eyler, Deborah S.,
Arthur,
Wilner, Alan M.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Arthur, J.
_____

Filed:  July 25, 2017

"An automated external defibrillator (AED) is a portable device that checks the heart rhythm and can send an electric shock to the heart to try to restore a normal rhythm." *What is an Automated External Defibrillator?*, NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health/health-topics/topics/aed (last viewed July 25, 2017).[1]

"AEDs are used to treat sudden cardiac arrest," which is "a condition in which the heart suddenly and unexpectedly stops beating." *Id.* When a person suffers sudden cardiac arrest, "blood stops flowing to the brain and other vital organs." *Id.*

Sudden cardiac arrest "usually causes death if it's not treated within minutes." *Id.*

---

[1] Maryland Code (1978, 2014 Repl. Vol.), § 13-517(a)(2) of the Education Article contains the following definition:

(2) "Automated external defibrillator (AED)" means a medical heart monitor and defibrillator device that:

(i) Is cleared for market by the federal Food and Drug Administration;

(ii) Recognizes the presence or absence of ventricular fibrillation or rapid ventricular tachycardia;

(iii) Determines, without intervention by an operator, whether defibrillation should be performed;

(iv) On determining that defibrillation should be performed, automatically charges; and

(v) 1. Requires operator intervention to deliver the electrical impulse; or

2. Automatically continues with delivery of electrical impulse.

Consequently, "[u]sing an AED on a person who is having [sudden cardiac arrest] may save the person's life." *Id.*

Maryland Code (1978, 2014 Repl. Vol.), § 13-517 of the Education Article establishes a public access program for AEDs in this State. In brief summary, the statute is designed to encourage the installation of AEDs in places of business and public accommodation, but to ensure that the devices are operable and are to be used by people who are properly trained to use them.

This case principally concerns whether § 13-517 of the Education Article or its accompanying regulations prescribe a duty of care that requires a business to use an AED to provide cardiac defibrillation to someone who has suffered or reasonably appears to have suffered sudden cardiac arrest. We hold that they do not.

## FACTUAL AND PROCEDURAL HISTORY[2]

### A. The Incident at the YMCA

On November 12, 2014, Vincent Trim, age 53, suddenly collapsed while he was playing basketball at a YMCA in Ellicott City. Julie Heard, a YMCA fitness instructor, was near the doors to the basketball court at the time. Ms. Heard had 20 years of training and experience in administering life support and resuscitation measures, including the use of an AED.

According to Ms. Heard, several people ran out of the court, asking someone to

---

[2] In recounting the factual background in this case, we rely on the allegations of the complaint, as well as the undisputed factual assertions in connection with a motion to dismiss or, in the alternative, for summary judgment.

call 911. Ms. Heard heard that someone had fainted. Another YMCA employee heard that a person was having a seizure. Yet another employee ran to the front desk to call 911.

Ms. Heard ran onto the court. She saw Mr. Trim lying unconscious on the floor. He had no pulse and was gasping (exhibiting "agonal breathing"), which is a potential sign of cardiac arrest. Ms. Heard began to administer cardiopulmonary resuscitation ("CPR"), and she directed a bystander to go to the front desk to call 911. While she was administering CPR, another member told her that she was already calling 911. Although the YMCA had an AED that was just outside the doors of the basketball court, Ms. Heard did not retrieve it or ask anyone to retrieve it for her.

As a result of Ms. Heard's efforts, Mr. Trim began to breathe on his own, but his breathing stopped again after a few seconds. With the assistance of another employee, Ms. Heard continued to administer CPR until the Howard County paramedics arrived, about five minutes after they were first called.

When the paramedics entered the court, a YMCA employee heard one of them say that he needed to go back to the ambulance to retrieve his AED. The employee told the paramedic that the YMCA's AED was just outside the doors of the basketball court. The paramedic instructed the employee to retrieve the AED, which he did.

The paramedics used the AED, but were unsuccessful in resuscitating Mr. Trim. He died a few days later as a result of a cardiac arrest and the consequent cessation of blood flow to his brain and other vital organs.

**B. Wrongful Death Action**

On April 27, 2015, Mr. Trim's widow, appellant Valerie Trim, filed a wrongful death and survival action against the YMCA. Citing the COMAR regulations that were propounded to implement § 13-517 of the Education Article, appellant principally alleged that the YMCA "had a statutory and/or regulatory duty to utilize the AED on its premises . . . after [Mr. Trim's] collapse in the gymnasium." Because it did not comply with that alleged duty, appellant alleged that the YMCA was negligent *per se*.[3]

The YMCA moved to dismiss the complaint, or alternatively, for summary judgment. It advanced three grounds: (1) that § 13-517 does not impose an affirmative duty to use an AED; (2) that the statute contains an immunity provision, which shields it from liability "for any act or omission in the provision of automated external defibrillation"; and (3) that an exculpatory clause within YMCA's membership agreement, which was signed by Mr. Trim, released it from liability.

After a hearing on April 28, 2016, the Circuit Court for Howard County granted the YMCA's motion. Appellant noted a timely appeal.

## QUESTIONS PRESENTED

Appellant presents three issues, which we have rephrased as follows:

1. Did the circuit court err in determining that § 13-517 of the Education Article or its implementing regulations do not establish a statutory duty of care by the YMCA and its employees?

---

[3] Contrary to that allegation, the violation of a statutory duty may afford evidence of negligence under Maryland law, but it does not establish negligence *per se*. *See, e.g.*, *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 126 (2014); *Absolon v. Dollahite*, 376 Md. 547, 557 (2003).

2. Did the circuit court err in determining that the YMCA and its employees were immune from civil liability under § 13-517 of the Education Article?

3. Did the circuit court err in determining that the YMCA membership agreement exculpated the YMCA and its employees from civil liability? [4]

In response to the first question, we hold that the statute and regulations do not establish a statutory duty of care that required the administration of automated external defibrillation in the circumstances of this case. In view of our answer to the first question, it is unnecessary to address the second and third questions. We shall affirm the circuit court's judgment.

**STANDARD OF REVIEW**

In its dispositive motion, the YMCA included materials outside of the pleading. The circuit court did not exclude those materials. Hence, the court was required to treat

---

[4] Appellant presented the questions as follows:

1. Whether the circuit court erred in determining that the Maryland Public Access Automated External Defibrillator Program Does Not Establish a Statutory Duty of Care Requiring Registered Facilities and Their Employees to Affirmatively Utilize the Onsite Automated External Defibrillator Device and Render Defibrillation to Individuals Suffering a Sudden Cardiac Arrest?

2. Whether the Circuit Court Erred in Determining that the YMCA and its Employees Were Immune from Civil Liability for Alleged Acts and/or Omissions of Negligence in Failing to Provide Automated External Defibrillation to Vince Trim Following His Sudden Cardiac Arrest?

3. Whether the Circuit Court Erred in Determining that the Language Contained in the YMCA Membership Agreement Exculpated the YMCA and its Employees from Civil Liability Stemming from Allegations of Negligence?

the motion, and did in fact treat it, as a motion for summary judgment. Md. Rule 2-322(c) ("[i]f, on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment"); *see also Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md. App. 772, 782 (1992).

On a motion for summary judgment, the court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f).

The propriety of a grant of summary judgment is a question of law. *Butler v. S & S P'ship*, 435 Md. 635, 665 (2013) (citation omitted). In an appeal from the grant of summary judgment, this Court conducts a de novo review to determine whether the circuit court's conclusions were legally correct. *See D'Aoust v. Diamond*, 424 Md. 549, 574 (2012).

In this case, unlike many summary judgment cases, there was no real dispute of fact: the dispute involved the purely legal question of whether § 13-517 of the Education Article or its implementing regulations imposed a duty of care on the YMCA to use an AED when Mr. Trim exhibited signs of sudden cardiac arrest. We conduct a de novo review of that exercise in statutory interpretation. *See, e.g.*, *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142 (2012); *Sail Zambezi, Ltd. v. Md. State Highway Admin.*, 217 Md. App. 138, 150 (2014).

**DISCUSSION**

"[I]n some instances, the duty of care in a negligence action may arise from statute or regulation." *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 103 (2014). "[W]here there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff," a "defendant's duty ordinarily is 'prescribed by the statute' or ordinance[,] and . . . the violation of the statute or ordinance is itself evidence of negligence." *Brooks v. Lewin III Realty, Inc.*, 378 Md. 70, 78 (2003) (quoting *Brown v. Dermer*, 357 Md. 344, 358-59 (2000)); *accord Blackburn Ltd. P'ship v. Paul*, 438 Md. at 111; *Gourdine v. Crews*, 405 Md. 722, 755 (2008); *Pendleton v. State*, 398 Md. 447, 466 (2007); *Remsburg v. Montgomery*, 376 Md. 568, 584 (2003).

"Under this principle, in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Brooks v. Lewin III Realty, Inc.*, 378 Md. at 79; *accord Blackburn Ltd. P'ship v. Paul*, 438 Md. at 112; *Kiriakos v. Phillips*, 448 Md. 440, 457 (2016); *Wietzke v. Chesapeake Conference Ass'n*, 421 Md. 355, 388 (2011); *C & M Builders, LLC v. Strub*, 420 Md. 268, 281-82 (2011).

Appellant contends that § 13-517 and its accompanying regulations were designed to protect a class of persons who, like her late husband, have suffered or reasonably appear to have suffered sudden cardiac arrest. She contends further that the statute and the regulations prescribe a duty of care that requires entities such as the YMCA to use an AED when a person has suffered or reasonably appears to have suffered sudden cardiac

- 7 -

arrest. Finally, she contends that her husband died as a proximate result of the YMCA's breach of that alleged duty.

We need not decide whether the General Assembly passed § 13-517 for the protection of the particular class that appellant has identified, whether Mr. Trim was a member of that class, or whether the failure to administer automated external defibrillation was a proximate cause of Mr. Trim's death. In this case, the decisive question is whether § 13-517 or the implementing regulations mandate that an entity like the YMCA use an AED when a person suffers or appears to have suffered sudden cardiac arrest.

To answer that question of statutory interpretation, we first examine the ordinary meaning of the enacted language. *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 665 (2014) (quoting *Nichols v. Suiter*, 435 Md. 324, 339 (2013)). "If the language of the statute is clear and unambiguous, we need not look beyond the language[.]" *Windesheim v. Larocca*, 443 Md. 312, 341 (2015) (citation and quotation marks omitted). "[A] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 359 (2013) (citation and quotation marks omitted). Nonetheless, to understand the meaning of statutory language, we must look beyond individual words and clauses to the larger context, including other surrounding provisions and the apparent purpose of the enactment. *See*, *e.g.*, *Williams v. Peninsula Regional Med. Ctr.*, 440 Md. 573, 580-81 (2014).

- 8 -

## I.    The Language of the Statute

Section 13-517(b)(1) of the Education Article establishes "a Public Access Automated External Defibrillator Program" – i.e., a program concerning public access to AEDs.  The program is administered by the Emergency Medical Services ("EMS") Board.  *Id.* § 13-517(b)(3).

The EMS Board has the power to adopt regulations to administer the program; to issue and renew certificates to "facilities" that meet the statutory requirements; and to deny, suspend, revoke, or refuse to renew a facility's certificate if it fails to meet the statutory requirements.  *Id.* § 13-517(c)(1)-(3).  The statute defines the term "facility" to mean "an agency, association, corporation, firm, partnership, or other entity."  *Id.* § 13-517(a)(4).  The YMCA is a "facility."

Subject to a few exceptions that are inapplicable to this case, "[e]ach facility that desires to make automated external defibrillation available shall possess a valid certificate from the EMS Board."  *Id.* § 13-517(d)(1).  To qualify for a certificate, a facility must:

> (1)   Comply with the written protocol approved by the EMS Board for the use of an AED which includes notification of the emergency medical services system through the use of the 911 universal emergency access number as soon as possible on the use of an AED;
>
> (2)   Have established automated external defibrillator maintenance, placement, operation, reporting, and quality improvement procedures as required by the EMS Board;
>
> (3)   Maintain each AED and all related equipment and supplies in accordance with the standards established by the device manufacturer and the federal Food and Drug Administration; and

(4) Ensure that each individual who is expected to operate an AED for the registered facility has successfully completed an educational training course and refresher training as required by the EMS Board.

*Id.* § 13-517(e)(1)-(4).

A certificate is valid for three years (*id.* § 13-517(h)(3)), and the EMS Board must issue a "renewed certificate to a facility that meets" the statutory requirements. *Id.* § 13-517(h)(1).

There is no dispute that, at the time of the events that gave rise to this case, the YMCA had a valid certificate. In the language of the statute, therefore, the YMCA was a "registered facility." *Id.* § 13-517(a)(10).

## II. Duties Under the Statute

In her brief, appellant acknowledges that "[t]he AED Statute and related COMAR regulations are silent as to whether or not a registered facility like the YMCA has an affirmative duty to provide and render automated external defibrillation in the event of a sudden cardiac arrest." In our view, the legislative and regulatory silence establish that § 13-517 imposes no affirmative duty on a registered facility like the YMCA.

The legislative silence in this statute stands in contrast to the affirmative obligations that were enunciated in statutes or ordinances that have been found to prescribe a duty of care towards members of a specific class. In each of those cases, the statute, ordinance, or regulation employed mandatory language to define what a person had a duty to do or to refrain from doing. *See*, *e.g.*, *Kiriakos v. Phillips*, 448 Md. at 495 (concluding that a social host owes a duty to persons injured as a result of a minor's underage drinking, where a statute provided that "an adult may not knowingly and

- 10 -

willfully allow an individual under the age of 21 years actually to possess or consume an alcoholic beverage at a residence"); *Blackburn Ltd. P'ship v. Paul*, 438 Md. at 125, 128 (concluding that an apartment complex owes a duty to unsupervised children where a regulation stated that "an owner shall ensure that a recreational pool . . . is completely surrounded by a barrier that . . . does not allow the passage of a sphere 4 inches in diameter," the size a young child's head); *Wietzke v. Chesapeake Conference Ass'n*, 421 Md. at 392-95 (concluding that a landowner owes a duty to its neighbors where an ordinance stated that "[a] person must not engage in any land-disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material, to be deposited upon or to roll, flow, or wash upon or over the premises of another in a manner to cause damage"); *Brooks v. Lewin Realty III, Inc.*, 378 Md. at 83, 89 (concluding that a landlord owed a duty to the occupants of a rental unit where ordinances stated that "[a]ll walls, ceilings, woodwork, doors and windows shall be kept clean and free of any flaking, loose, or peeling paint" and that "[a]ll interior loose or peeling wall covering or paint shall be removed"); *Moore v. Myers*, 161 Md. App. 349, 364 (2005) (concluding that owners of pit bull terriers owed a duty to persons attacked by their dogs where an ordinance stated that "[t]he owner shall maintain the dog within a building or a secure kennel" and that "[w]henever the dog is removed from the building or kennel it shall be secured by an unbreakable or unseverable leash and maintained under the control of an adult"); *compare Pace v. State*, 425 Md. 145, 169-70 (2012) (concluding that a federal statute did not impose a statutory duty of care on the defendant, where the petitioner "could not 'identify . . . specific words and phrases in the [statute]

- 11 -

that . . . obligated the . . . State defendants to take some specific action") (internal quotation omitted).

Nothing in § 13-517 obligated the YMCA to take any specific action when Mr. Trim exhibited signs of sudden cardiac arrest. The statute, therefore, does not impose an affirmative obligation on the YMCA to use the AED.

## III.     The Implementing Regulations

In arguing that a registered facility has an affirmative duty to use an AED whenever a person suffers or reasonably appears to have suffered sudden cardiac arrest, appellant relies largely on the implementing regulations that the EMS Board adopted, not on the language of the statute itself. Appellant incorrectly refers to the regulations as "the words utilized by the Legislature," which they are not.[5]

Nonetheless, assuming that the EMS Board could prescribe a duty of care on registered facilities like the YMCA, its regulations do not, in our view, impose an affirmative duty to use an AED when a person suffers or reasonably appears to have suffered sudden cardiac arrest.

Among other things, the regulations require a facility to designate an AED coordinator who has received CPR and AED training and who must ensure that the AED

---

[5] It is true that, insofar as a regulation illustrates an agency's understanding of the authority that the legislature has delegated to it, the regulation may supply some indirect evidence of the meaning of a statute. *See Christ by Christ v. Md. Dep't of Nat. Res.*, 335 Md. 427, 437 (1994). But to understand what a statute means, we typically look to the statutory language itself, not to the implementing regulations. Again, it is telling that appellant does not base an argument on the statutory language itself.

equipment is regularly inspected (presumably to ensure that it works).  *See* COMAR 30.06.02.01(A).  They require a facility to inform its employees and volunteers about the operation, maintenance, and location of its AEDs.  *See id*. 30.06.02.01(B).  They require a facility to place its AEDs in locations that are visible and readily accessible to anyone who might be willing to operate them in case of an instance of cardiac arrest.  *See id*. 30.06.02.01(C).  They require a facility to have a telephone or "other communication service" to notify public safety officials in case of an emergency.  *See id*. 30.06.02.01(D). They require the facility to submit data to the Maryland Institute for Emergency Medical Services Systems.  *See id*. 30.06.02.01(E).  They require the facility to ensure that all "expected operators," which are defined as "individual[s] identified by a registered facility to operate an AED at a registered facility" (*see id*. 30.06.01.01(B)(3)), have completed CPR and AED training.  *See id.* 30.06.02.01(F).  Finally, in a section titled "Protocol," they state that "[a]ll personnel who are expected to operate an AED" must "utilize the AED in accordance with their training."  *See id*. 30.06.02.02.

Nothing in these regulations imposes an affirmative duty to use an AED whenever a person suffers or reasonably appears to have suffered sudden cardiac arrest.  The regulations simply require a facility to obtain training for the persons who may operate the device, to take steps to ensure that the device will work if it is needed, to inform employees and volunteers about where the devices are located and how they work, to have a means of communicating with the authorities in case of an emergency, and to make reports to the governing body.  Most of the regulations are concerned only with

- 13 -

what a facility must do in order to obtain a certificate. Neither the statute nor the regulations, therefore, creates the duty that appellant seeks to enforce.

## IV.    Legislative History of the Statute

Appellant goes on to argue that the drafting history of § 13-517 reveals a legislative intention to require registered facilities to use AEDs whenever a person suffers or reasonably appears to have suffered sudden cardiac arrest. Although Maryland courts ordinarily do not look to legislative history if, as in this case, the meaning of a statute is clear on its face (*see W.R. Grace & Co. v. Swedo*, 439 Md. 441, 453-55 (2014)), we have considered appellant's arguments and found them wanting.

The General Assembly enacted the original version of § 13-517 in 1999. Appellant focuses on amendments that occurred in 2008.

Before the 2008 amendments, the statute contained the following language:

(c)  The EMS board may: . . . (5) Approve educational and training programs required under this section that . . . (ii) Include training in cardiopulmonary resuscitation . . . .

*        *        *        *

(f)  To qualify for a certificate a facility shall: . . . (6) Ensure that each individual who operates an automated external defibrillator for the authorized facility has successfully completed an education training course and refresher training as required by the EMS Board.

*        *        *        *

(j)  An individual who is authorized to operate an automated external defibrillator at an authorized facility may administer automated external defibrillation to an individual who is reasonably believed to be a victim of sudden cardiac arrest if physician services or emergency medical services are not immediately available.

Md. Code (1978, 2006 Repl. Vol.), § 13-517 of the Education Article.

In 2008 the General Assembly altered those provisions in the following manner:

(c)  The EMS board may: . . . ~~(5)~~(4) Approve educational and training programs required under this section that . . . (ii) Include training in cardiopulmonary resuscitation **AND AUTOMATED EXTERNAL DEFIBRILLATION** . . . .

\*        \*        \*        \*

~~(f)~~(e)  To qualify for a certificate a facility shall: . . . ~~(6)~~ (4) Ensure that each individual who ~~operates~~ **IS EXPECTED TO OPERATE** an ~~automated external defibrillator~~ **AED** for the ~~authorized~~ **REGISTERED** facility has successfully completed an education training course and refresher training as required by the EMS Board.

\*        \*        \*        \*

~~(j) An individual who is authorized to operate an automated external defibrillator at an authorized facility may administer automated external defibrillation to an individual who is reasonably believed to be a victim of sudden cardiac arrest if physician services or emergency medical services are not immediately available.~~

2008 Md. Laws, ch. 593, § 1.[6]

Appellant focuses, first, on the removal of former subsection (j), which said that an "authorized" person at an "authorized facility" "*may* administer automated external defibrillation[.]"  (Emphasis added.)  She argues that by deleting the paragraph that contained the permissive verb "may," the legislature "essentially endorsed an implicit reading and interpretation," under which a facility "shall" provide automated external

------

[6] The 2008 legislation is accessible through the General Assembly's website, http://mgaleg.maryland.gov.

defibrillation if a person suffers (or reasonably appears to have suffered) sudden cardiac distress.

Appellant tacitly concedes the case with the equivocal language about "implicit" readings. To ascertain what a statute means, a court looks at the actual language of the statute and does not add language that the legislature did not include. Nothing in the actual language states or even implies that a facility has an affirmative obligation to use an AED in any circumstance.

Appellant goes on to cite the amendment to what is now subsection (e)(4). In that amendment the legislature changed the phrase "an individual who operates an automated external defibrillator" to "an individual who is expected to operate an AED." In her view, the change "establishes an affirmative and 'expected' duty on the part of a registered facility."

Appellant's contention is unpersuasive. In full, subsection (e)(4) states that "[t]o qualify for a certificate a facility shall: . . . (4) Ensure that each individual who is expected to operate an AED for the registered facility has successfully completed an educational training course and refresher training as required by the EMS Board." In context, this language means that a facility can obtain a certificate only if the person who is expected (i.e. anticipated) to use its AED has the proper training to use the AED. This language does not create a duty to use an AED in any specific set of circumstances; it simply creates a condition precedent for the acquisition of certificate. The legislature did not surreptitiously incorporate an affirmative duty to use an AED when it required an

expected (or anticipated) operator to receive training before a facility could receive a certificate.

Appellant concludes with a rhetorical question about why the legislature would establish a statewide program for public access to AEDs unless it intended that registered facilities would have an affirmative obligation to use them. The short answer is that the legislature wanted to encourage businesses, public facilities, and places of public accommodation to make these life-saving devices available, while ensuring that the devices would work, that people knew where they were located, and that they would be used by persons with proper training if they are used at all.

The Court of Appeals of New York has expressed a similar insight. In *Miglino v. Bally Total Fitness of Greater New York, Inc.*, 20 N.Y.3d 342 (2013), that court held that even though a statute required a fitness club to install an AED and to have at least one employee or volunteer who held a valid certification in the use of the device, the club had no affirmative duty to use the AED when a member suffered sudden cardiac arrest. *Id.* at 349. In rejecting the contention that its interpretation rendered the statute meaningless, the court stated, "[T]here is nothing meaningless or purposeless about a statute that seeks to insure the availability of AEDs and individuals trained in their use at locations – i.e., health clubs – where there is a population at higher risk of sudden cardiac arrest." *Id.* "A law that mandates the presence of AEDs and trained individuals at health clubs is easy to obey and enforce," the court added. *Id.* By contrast, an affirmative duty to employ the device in specific circumstances "would engender a whole new field of tort litigation, saddling health clubs with new costs and generating uncertainty." *Id.* at 349-50. The

- 17 -

court concluded that "[t]he legislature is unlikely to have imposed such a new duty absent an express statement." *Id.* at 350. We agree.

## CONCLUSION

In summary, we hold that § 13-517 of the Education Article and its implementing regulations do not impose an affirmative obligation on registered facilities, like the YMCA, to use an AED when a person suffers, or reasonably appears to have suffered, sudden cardiac arrest. Consequently, we affirm the grant of the YMCA's dispositive motion.[7]

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[7] In view of our decision, it is unnecessary to decide whether the failure to use the AED at all amounts to an "omission in the provision of automated external defibrillation," which would render the YMCA immune from civil liability under § 13-517(j)(1) of the Education Article. It is also unnecessary to decide whether the exculpatory language in the YMCA's membership agreement operates as a prospective release of the claims in this case.