Filed 4/11/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARYAM DAY et al., | B282996 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC623354) |
| v. | |
| LUPO VINE STREET, L.P., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Ruth A. Kwan, Judge. Affirmed.

LippSmith Law, MaryBeth LippSmith; Ryan Law and Andrew T. Ryan for Plaintiffs and Appellants.

Hartsuyker, Stratman & Williams-Abrego, John R. Miller; Horvitz & Levy, Stephen E. Norris and Eric S. Boorstin for Defendants and Respondents.

Health and Safety Code[1] section 104113 requires every "health studio" – which is defined as "a facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, body building, reducing, figure development, fitness training, or any other similar purpose, on a membership basis" (§ 104113, subd. (h)) – to acquire and maintain an automated external defibrillator (AED) on the premises. The question presented in this case is: Does a commercial landlord who leases space to an operator of a health studio owe a duty under this statute or the common law to acquire and maintain an AED at the space or ensure that the operator does so? We conclude there is no such duty. Accordingly, we affirm the trial court's summary judgment in favor of defendants Lupo Vine Street L.P. and Sarah M. Lupo as Trustee of the Fred D. Lupo and Sarah M. Lupo Living Trust (collectively, Lupo).

## BACKGROUND

Lupo owns a multi-unit commercial building in Los Angeles. In 2011, Lupo entered into a five-year lease with Wild Card Boxing Club, Inc.[2] for two units, covering approximately 5,000 square feet of space, for use as a "Boxing Club/Athletic Club." Before signing the lease on behalf of Lupo, John Lupo inspected the premises by taking a "visual

---

[1] Further undesignated statutory references are to the Health and Safety Code.

[2] Although the lease names the tenant as "Wildcard Boxing Club, Inc.," Freddie Roach (who signed the lease on behalf of Wildcard Boxing Club, Inc.) ran the business as Wild Card Boxing Gym.

walk-through, general bird's eye view," looking for "[r]oof leaks, water leaks, running toilet, plaster falling off the walls." Lupo has never had any ownership or other interest in Wild Card.

On January 30, 2016, Omorishanla Olayinka was working out with a trainer at Wild Card when he suffered a fatal heart attack. Wild Card did not have an AED on the premises.

Olayinka's surviving spouse, Maryam Day, and daughter, Ayodele Omotolani Ifatosin Olayinka (through her guardian ad litem Maryam Day), and Olayinka's estate filed a lawsuit against Wild Card, its owner Freddie Roach, and Lupo, alleging claims for negligence per se and negligence based upon the failure to maintain an AED on the premises of Wild Card.

Lupo moved for summary judgment on the ground, among others, that it had no duty under section 104113 or the common law to furnish the premises with an AED or to ensure that the gym owner did so. The trial court agreed. It found that Lupo did not have a statutory duty because the definition of "health studio" does not include "mere property owners and/or landlords." It also concluded that it would be unreasonable to impose a duty on a mere property owner or landlord to inspect property being leased for use as a boxing training gym to ensure compliance with section 104113. The court entered judgment in favor of Lupo, from which plaintiffs timely filed a notice of appeal.

## DISCUSSION

### A. *Statutory Duty*

As noted, section 104113 requires every "health studio" to acquire and maintain an AED (§ 104113, subd. (a)) on its premises, and defines "health studio" as "a facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, body building, reducing, figure development, fitness training, or any other similar purpose, on a membership basis" (§ 104113, subd. (h)).  Plaintiffs argue on appeal that Lupo falls within the definition of "health studio" – and thus has a statutory duty to acquire and maintain an AED – because it expressly agreed in its lease with Wild Card to allow people to use its "facility" for physical exercise.  We disagree.

In making this argument, plaintiffs ignore two important components of the definition of a "health studio."  To meet the definition, a "health studio" must permit the use or access to "its facilities *and equipment*" to individuals or groups *on a membership basis*.  (§ 104113, subd. (h), italics added.)  Plaintiffs point to no evidence that Lupo offered anyone the use of its equipment, let alone that it did so on a membership basis.  Thus, Lupo clearly falls outside the definition of "health studio."

The fact that section 104113 did not intend to include within its scope landlords who simply lease space to a "health studio" is reinforced by other provisions of the statute.  The statute does not merely require that health studios acquire and maintain an AED.  It also requires the health studio, among other things, to check the AED for readiness after

4

each use and at least once every 30 days, and to maintain records of those checks (§ 104113, subd. (e)(2)(B)); to ensure that a person who uses the AED notifies the emergency medical services system as soon as possible and reports the use of the AED (§ 104113, subd. (e)(2)(C)); to ensure that at least one employee per AED completes a training course in cardiopulmonary resuscitation and AED use, and that trained employees are available to respond to an emergency during staffed operating hours (§ 104113, subd. (e)(2)(D)); to report to the Legislature the average number of hours per week the health studio was staffed, the total number of reported cardiac incidents that occurred during unstaffed hours, and whether any of those incidents resulted in death (§ 104113, subd. (e)(3)(D)).

A landlord who merely leases space to a "health studio" is not in a position to comply with any of these requirements. Thus, we find that Lupo did not have a statutory duty to acquire or maintain an AED.[3]

B.    *Common Law Duty*

Plaintiffs contend that even if Lupo did not have a statutory duty to acquire and maintain an AED, it had a common law duty "to ensure the premises were equipped with an AED before Wild Card took

---

[3]    Because we find that the plain language of section 104113 demonstrates that a landlord who merely leases space to a tenant to operate a heath studio is not required to meet the requirements of that statute, we deny Lupo's request that we take judicial notice of the legislative history of the statute. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [where there is no ambiguity in the statutory language, "we presume the lawmakers meant what they said, and the plain meaning of the language governs"].)

possession of the boxing gym." They contend that this duty required Lupo either to provide an AED at the premises that it leased to Wild Card to operate a boxing gym, or to specifically require Wild Card to obtain and maintain an AED as a condition of the lease. We find no such duty applies under the circumstances presented here.

### 1. *Negligence Principles*

"The elements of a cause of action for negligence are: the 'defendant had a duty to use due care, that he [or she] breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'" (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 278 (*Vasquez*).) "The existence of duty is a question of law to be decided by the court [citation], and the courts have repeatedly declared the existence of a duty by landowners to maintain property in their possession and control in a reasonably safe condition. [Citation.] However, acknowledgment of the broad proposition that landowners have a duty to exercise reasonable care to maintain their property in a safe condition provides scant guidance to a court that must determine the existence of the landlord's duty in a particular case." (*Id.* at pp. 278-279.)

With regard to landlords, "reasonable care ordinarily involves making sure the property is safe at the beginning of the tenancy, and repairing any hazards the landlord learns about later." (*Stone v. Center Trust Retail Properties, Inc.* (2008) 163 Cal.App.4th 608, 612.) "'Because a landlord has relinquished possessory interest in the land, his or her duty of care to third parties injured on the land is attenuated

6

as compared with the tenant who enjoys possession and control. Thus, before liability may be thrust on a landlord for a third party's injury due to a dangerous condition on the land, the plaintiff must show that the landlord had actual knowledge of the dangerous condition in question, plus the right and ability to cure the condition.'" (*Id.* at p. 612, quoting *Mata v. Mata* (2003) 105 Cal.App.4th 1121, 1131-1132, disapproved in part on another ground in *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 247-250.)

The existence of a duty "'is not an immutable fact, but rather an expression of policy considerations leading to the legal conclusion that a plaintiff is entitled to a defendant's protection.' [Citation.] . . . "'[D]uty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same – to conform to the legal standard of reasonable conduct in the light of the apparent risk.' [Citation.]" (*Vasquez, supra*, 118 Cal.App.4th at p. 279.)

In *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), the Supreme Court identified a number of factors that courts may consider to determine whether a duty applies in a particular case: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for

7

the risk involved." (*Id.* at p. 113.) "It is settled, however, that 'the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk.'" (*Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 695.) But even when a risk is forseeable, "'policy considerations may dictate a cause of action should not be sanctioned.'" (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 476.)

With these principles in mind, we address plaintiffs' contention that Lupo owed a duty to Wild Card's patrons to (1) provide an AED on the premises where Wild Card operated its boxing gym, or (2) require as a condition of Lupo's lease with Wild Card that Wild Card provide an AED on the premises.

2.     *Duty of Lupo to Provide an AED*

The Supreme Court recently addressed the issue whether a large department store owed its customers a duty to make available on its premises an AED for use in a medical emergency. (*Verdugo v. Target Corp.* (2014) 59 Cal.4th 312 (*Verdugo*).) Although there are two important distinctions between that case and the present case (which we address below), the Court's opinion provides useful guidance for our analysis of the duty owed here.

The Supreme Court observed that when determining whether a business owes a "*duty to take precautionary steps prior to the time . . . an injury or illness has occurred*" – such as having an AED on premises in case a patron suffers a cardiac arrest – California courts primarily

8

look at "a number of factors, including (1) the degree of foreseeability that the danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business. [Citations.] If the relative burden of providing a particular precautionary safety or security measure is onerous rather than minimal, the governing cases have held that absent a showing of a 'heightened' or 'high degree' of foreseeability of the danger in question, it is not appropriate for courts to recognize or impose a common law duty to provide the measure." (*Verdugo, supra,* 59 Cal.4th at p. 338.)

Addressing the burden of providing an AED for the use of Target's patrons, the Supreme Court found it would be "considerably more than a minor or minimal burden on a business establishment. The statutory provisions and related regulations establishing the prerequisites to civil immunity for those entities acquiring an AED reflect the numerous related requirements that a jury is likely to view as reasonably necessary to comply with such a duty. Apart from the initial cost of the AEDs themselves, significant obligations with regard to the number, the placement, and the ongoing maintenance of such devices, combined with the need to regularly train personnel to properly utilize and service the AEDs and to administer CPR, as well as to have trained personnel reasonably available on the business premises, illustrate the magnitude of the burden. (See Health & Saf. Code, § 1797.196, subd. (b); Cal. Code Regs., tit. 22, §§ 100031–100056.2.) Compliance with these numerous obligations clearly implicates more than a minor or minimal burden." (*Verdugo, supra,* 59 Cal.4th at p. 340.)

9

With respect to foreseeability, the Supreme Court found there was no allegation that any aspect of Target's operations or the activities that its customers engage in on the premises gives rise to a high degree of foreseeability that those customers will suffer cardiac arrest on the premises. "Instead, it appears that the risk of such an occurrence is no greater at Target than at any other location open to the public." (*Verdugo*, *supra*, 59 Cal.4th at p. 340.)  Therefore, the Court concluded that Target owed no common law duty to its customers to acquire and make available an AED.

As noted, there are two significant differences between the facts of *Verdugo* and the facts of this case.  First, *Verdugo* involved the duty owed by the operator of a business to its customers, whereas the present case involves the duty of a landlord to the patrons of its tenant's business – a far more attenuated relationship.  Second, the customers in *Verdugo* did not have any greater risk of suffering cardiac arrest on the premises than at any other place, while the patrons of the boxing gym were at a somewhat heightened risk of suffering cardiac arrest while working out on the premises.  But on balance, those differences weigh in favor of finding no duty here.

First, the burden that the Supreme Court found was "considerably more" than minor or minimal with respect to Target would be even greater with respect to Lupo.  The Court noted that providing an AED does not simply entail purchasing the device and keeping it on the property.  Rather, it requires compliance with numerous statutory and

regulatory obligations.[4] Those include (1) ensuring that the AED is maintained and tested according to the operation and maintenance guidelines set forth by the manufacturer; (2) ensuring that the AED is tested at least biannually and after each use; and (3) ensuring that an inspection is made of all AEDs on the premises at least every 90 days for potential issues related to operability of the device. (§ 1797.196, subd. (b).) Unlike Target, which was the operator of the business and therefore had possession and control of the premises and would have the ability to ensure compliance with these requirements, Lupo is a landlord out of possession of the premises. Imposing a duty to provide an AED in this instance would require Lupo to stay in constant contact with its tenant to see if the AED had been used (so it could be tested) and to obtain permission to enter the premises at least every 90 days to inspect the AED. This is a far greater burden than that which would have been imposed on Target.

Second, although plaintiffs contend that it was foreseeable that a patron of the boxing gym might suffer cardiac arrest because "'[i]t is a matter of common experience and knowledge' that people may experience heart problems during strenuous exercise," we question whether that purported "common experience and knowledge" may be imputed to Lupo, inasmuch as there is no evidence that any of the

---

[4]     We note that some of the statutes and regulations cited by the Supreme Court in *Verdugo, supra*, 59 Cal.4th at page 340 have been amended or repealed, resulting in the elimination of some of the requirements. (See Stats. 2015, ch. 264 (Sen. Bill No. 658), § 2.) While those amendments somewhat lessened the burden, many of the requirements remain.

11

principals of Lupo had any experience in the sports, health, or fitness business. (See *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307, 328 (*Rotolo*) [finding that knowledge of statements made in sports journals and other publications that cardiac arrest is the leading cause of death among athletes who participate in strenuous sports activities cannot be imputed to the defendant, an operator of a hockey rink], disapproved on other grounds in *Verdugo, supra,* 59 Cal.4th at pp. 328-329.) Thus, it is uncertain whether there was a sufficiently "'heightened' or 'high degree' of foreseeability of the danger in question" (*Verdugo, supra,* 59 Cal.4th at p. 338) to outweigh the considerable burden that would be placed on Lupo if we were to find a common law duty to provide an AED on the premises of the boxing gym.

Finally, even if it is "common experience and knowledge" that people who engage in strenuous exercise may experience heart problems, the question remains whether it is sound policy to require a landlord to investigate all of the dangers posed by the operation of the business of each of its tenants and to provide measures or devices to mitigate injuries caused by the tenant's business rather than by any dangerous condition on the property itself. We conclude it is not. "A landlord cannot be held to be responsible for all dangers inherent in a dangerous business." (*Mora v. Baker Commodities, Inc.* (1989) 210 Cal.App.3d 771, 780.) Accordingly, we hold that the trial court correctly found that Lupo did not owe a duty to provide an AED on the premises where Wild Card operated its boxing gym.

### 3. *Duty of Lupo to Ensure That Wild Card Provided an AED*

Having determined that Lupo did not owe a duty to Wild Card's patrons to provide an AED on the premises, we must now determine whether Lupo owed a duty to require as a condition of its lease that Wild Card provide an AED on the premises. The short answer is that Lupo *did* require Wild Card to provide an AED, because the lease required Wild Card to comply with all laws and statutes, which would include section 104113.[5] But even if this provision was insufficient because it did not specifically identify section 104113, we nevertheless conclude, based upon the *Rowland* factors, that Lupo did not owe a duty to specifically require Wild Card to provide an AED at the premises.

Applying the first *Rowland* factor – the foreseeability of harm to the plaintiff – requires a two-step process under the circumstances here. First, we must determine the foreseeability that Olayinka would suffer a sudden cardiac arrest. Second, we must determine the foreseeability that Wild Card would ignore its statutory duty to provide an AED while operating a boxing gym.

As discussed in Section B.2., *ante*, plaintiffs contend it is a matter of "common experience and knowledge" that there is an increased risk of suffering heart problems for someone who is engaging in strenuous

---

[5] Specifically, the lease stated: "Tenant shall not do anything or suffer anything done in or about the Premises . . . which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement. . . . Tenant shall promptly comply with all such governmental measures, both federal and state and county or municipal . . . whether those statutes, ordinances, regulations and requirements are now in force or are subsequently enacted."

exercise, but it is uncertain whether that "common experience and knowledge" can be imputed to Lupo. Moreover, Wild Card, as an experienced operator of a boxing gym, was in a far better position to recognize the risk to its patrons than was Lupo, a mere landlord. (See *Leakes v. Shamoun* (1986) 187 Cal.App.3d 772, 777 [affirming dismissal on demurrer of negligence claim against landlord, finding that although it could not say as a matter of law that the plaintiff's injury was unforeseeable, "we must nonetheless recognize that [the defendant's] ability to foresee the danger was limited in his role as a landlord"].)

But even if we were to find in the first step that it was foreseeable to Lupo that Wild Card's patrons were at heightened risk of suffering sudden cardiac arrest, we find it was not reasonably foreseeable that Wild Card would ignore its statutory duty. "[E]very person has a right to presume that every other person will perform his duty and obey the law and in the absence of reasonable ground to think otherwise, it is not negligence to assume that he is not exposed to danger which could come to him only from violation of law or duty by such other person." (*Celli v. Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 523.) In this case, there is no evidence to suggest that there was any reason for Lupo to think that Wild Card would not perform its duty under the law. Thus, we conclude it was not reasonably foreseeable to Lupo that Wild Card would not provide an AED on the premises while it operated a boxing gym.

Because, as the Supreme Court has repeatedly instructed, "foreseeability is a 'crucial factor' in determining the existence and scope of a legal duty" (*Delgado v. Trax Bar & Grill*, *supra*, 36 Cal.4th at

14

p. 237), we might end our analysis here and find that Lupo had no duty to ensure that Wild Card provided an AED on its premises. But application of the remaining *Rowland* factors also leads us to conclude there is no such duty.

The second factor – the degree of certainty that the plaintiff (or plaintiffs' decedent) suffered injury – weighs somewhat in favor of plaintiffs. While there is no doubt that Olayinka suffered a cardiac arrest, it is not certain that his death would have been prevented had an AED been available on the premises. The remaining factors, however, weigh in favor of finding no duty.

With regard to the third factor – the closeness of the connection between the defendant's conduct and the injury suffered – there is *no* connection between anything Lupo did or did not do and Olayinka's cardiac arrest. In this respect, this case is similar to *Rotolo*, in which the survivors of a teenager who suffered a heart attack while playing hockey at the defendants' facility sought to recover negligence damages for the defendants' failure to notify users of the facility of the existence and location of an AED on the premises. The court found that "[e]ven assuming . . . that respondents possessed a general knowledge that athletes may succumb to sudden cardiac arrest during strenuous activities, they could not have prevented such an occurrence, which is a risk assumed by those playing the sport. There is therefore no close connection between anything respondents did or did not do and the injury suffered by [the victim] that led to his death." (*Rotolo, supra,* 151 Cal.App.4th at p. 337.)

The fourth factor – the moral blame attached to the defendant's conduct – also favors Lupo. "[T]his factor in the duty analysis is intended to describe a high degree of moral culpability beyond that associated with ordinary negligence. "'Moral blame has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts. To avoid redundancy with the other *Rowland* factors, the moral blame that attends ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of liability. [Citation.] Instead, courts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts [citation].'" [Citations.]" (*Rotolo, supra,* 151 Cal.App.4th at pp. 337-338.) There is no evidence that Lupo intended Olayinka's death, had knowledge that its failure to require Wild Card to provide an AED would result in Olayinka's death, acted in bad faith, or engaged in any inherently harmful acts. Thus, there is no moral blame to be assigned to Lupo.

With regard to the fifth factor – the policy of preventing future harm – the Legislature has already mandated that the operators of all health studios provide an AED on their premises. Thus, there is no need to impose a duty upon the landlord to prevent future harm.

The sixth factor – the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with

16

resulting liability for breach – also weighs in favor of not imposing a duty on a commercial landlord to specifically require its tenant to provide an AED. As discussed in Section B.2., *ante*, imposition of such a duty would in essence require commercial landlords to investigate each tenant's business to determine what, if any, dangers that business poses to its patrons, and then to determine what, if any, measures could be taken to mitigate those dangers, and then require those measures be taken as a condition of the lease. This is too great a burden to impose here, especially in light of the fact that Wild Card already was required by statute to provide an AED to protect its patrons.

The final *Rowland* factor – the availability, cost, and prevalence of insurance for the risk involved – is not at issue here, because the record before the trial court did not include any evidence regarding insurance.[6] (See *Formet v. The Lloyd Termite Control Co.* (2010) 185 Cal.App.4th 9595, 604 [court cannot evaluate insurance factor in the absence of evidence regarding liability insurance].)

In sum, the balance of the *Rowland* factors weigh in favor of finding that Lupo did not owe plaintiffs a duty to ensure that Wild Card obtain and maintain an AED on the premises where it operated its boxing gym. Accordingly, the trial court did not err in granting Lupo summary judgment on the ground that plaintiffs could not establish a necessary element of their negligence cause of action.

---

[6]     Although plaintiffs argued that this factor favored imposing a duty upon Lupo in their appellants' opening brief, they conceded in their appellants' reply brief that the record before the trial court contained no evidence of insurance.

## DISPOSITION

The judgment is affirmed.  Lupo shall recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**


WILLHITE, Acting P. J.


We concur:


MANELLA, J.


COLLINS, J.

18