Filed 9/28/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KHALDA JABO et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>YMCA OF SAN DIEGO COUNTY,<br><br>    Defendant and Respondent. | D072613<br><br><br>(Super. Ct. No. 37-2016-00031790-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Timothy B. Taylor, Judge. Affirmed.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna and Jeffrey M. Trissell for

Plaintiffs and Appellants.

Horvitz & Levy, David M. Axelrad, S. Thomas Todd; Parker Straus and

Andrew S. Meyers for Defendant and Respondent.

Defendant and respondent YMCA of San Diego County (Respondent or the

YMCA) provides a number of automatic external defibrillators (AEDs) on its premises,

for the emergency use of its members, employees and users of the premises. (Health &

Saf. Code,[1] § 1797.196, subd. (b) [regulatory scheme when AEDs are provided on premises].)  Plaintiffs and appellants are the Jabo family, whose 43-year-old husband and father, Adeal Jabo (Jabo) died of sudden cardiac arrest on July 12, 2016, after playing soccer at an enclosed East County field owned by Respondent and regularly rented to a private organization of which Jabo was a member, the Over 40 Chaldean Soccer League of San Diego (the League).[2]  We are required to consider whether additional statutory or common law duties were owed by Respondent to ensure that its trained staff members utilize and apply AEDs under circumstances in which an adult is having an on-site medical emergency that appears to be sudden cardiac arrest, while the adult is a permissive user of the facility whose group rented an outdoor portion of Respondent's sports facilities, a soccer field.  (§ 104113 [duty of health studio to provide AED]; Civ. Code, § 1714.21, subd. (d) ["Good Samaritan" defense applicable to rendering of emergency care in use of AED at scene of emergency]; *Verdugo v. Target Corp*. (2014) 59 Cal.4th 312, 321 (*Verdugo*).)

---

[1]     All further statutory references are to the Health and Safety Code unless noted. Section 1797.196, subdivision (b) provides that when an entity acquires an AED to ensure public safety, it shall comply with applicable regulations governing placement, maintenance and testing of the device, and make appropriate notifications to officials and to tenants that the device is present at the site.  Section 1797.196, subdivision (f) states that the section, in combination with Civil Code section 1714.21, does not impose a mandatory duty to obtain AEDs.

[2]     Chaldeans are an ethnic group of Iraqi origin.  Jabo's survivors are referred to collectively here as "Appellants," including his widow Khalda and his adult and minor sons, Jacob, Paul, Fraduin, and Ruviail.

In Appellants' wrongful death complaint against Respondent, they seek damages on theories of ordinary and gross negligence arising from alleged violations of statutory and common law duties, based on Jabo's status as a League member using the facility's field. Appellants alleged that although one of Respondent's part-time employees was assigned to serve as scorekeeper for the League's games that evening, he was away from the field at the moment that Jabo collapsed and did not bring one of the five AED devices it had acquired to the field.[3] Respondent did not dispute that for its own scheduled events, its policy was to have one of its staff members check out and bring an AED to the field. Respondent admits that its failure to schedule the League games on its regular AED checkout list was due to a staff mistake arising from the private rental status of the League.

After extensive litigation that included Respondent's filing of an indemnity cross-complaint based on a release of liability that Jabo had signed, the trial court ultimately granted a defense summary judgment on the complaint, finding that the essential element of duty could not be established by Appellants. (Code Civ. Proc., § 437c.) The court dismissed Respondent's cross-complaint, finding that the release was unenforceable. As a whole, the ruling tracked the analysis in the leading case of *Verdugo, supra,*

---

[3] " 'Cardiac arrest is the abrupt loss of heart function in a person who may or may not have heart disease. The time and mode of death are unexpected. . . . Most cardiac arrests are due to abnormal heart rhythms called arrhythmias. A common arrhythmia is ventricular fibrillation, in which the heart's electrical impulses suddenly become chaotic and ineffective.' " (*Verdugo, supra,* 59 Cal.4th 312, 319.) Where indicated by the application of the AED mechanism to an unconscious victim, a prompt delivery of an electrical shock to the heart can greatly improve the chances of survival. (*Ibid.*)

59 Cal.4th 312, 316-317, in which our Supreme Court held that the existing California statutory scheme for the acquisition and use of AEDs does not preclude the courts from making determinations, under common law, on whether additional duties of care to customers should be imposed on business owners regarding acquisition of AEDs, to be made available for use by trained staff members or others, when such medical emergencies arise. (*Id.* at p. 336, fn. 18 [acquisition includes duty to train, etc.].)

In *Verdugo*, *supra*, 59 Cal.4th 312, the court engaged in traditional common law duty analysis for whether a retail business owes its patrons a duty of reasonable care to supply AEDs, in which " 'the specific action or actions the plaintiff claims the defendant had a duty to undertake,' " must be identified. (*Id.* at p. 337.) In considering whether such a common law duty should be recognized, "either in general or in particular circumstances," the courts should take into account existing California AED statutes, "insofar as such statutes bear on the relevant policy considerations that affect that determination." (*Id.* at pp. 334-335.) In *Verdugo* the court concluded that Target, as a retailer, did not incur such an obligation pursuant to section 1797.196 or Civil Code section 1714.21 to take precautionary measures, as distinguished from calling for medical assistance, in the absence of a showing of heightened foreseeability of the particular risk at issue. (*Verdugo, supra,* at pp. 339, 342.) In the course of its analysis, the court noted that different rules and particular obligations apply to "health (or fitness) studios," in the

4

form of section 104113.[4] (*Verdugo*, *supra*, 59 Cal.4th at pp. 323-324 & fn. 10 [medical facilities must be equipped with AEDs under separate regulatory requirements; "[h]ealth studios are currently the only nonmedical setting in which California statutes or regulations require that AEDs be provided"]; see fns. 17 & 18, *post,* on recent statutory additions in other contexts.)

We evaluate Appellants' challenge to the grant of summary judgment to Respondent in light of the analytical guidance provided by *Verdugo*, *supra*, 59 Cal.4th 312. " 'Duty, being a question of law, is particularly amenable to resolution by summary judgment.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents of University of California*).) The issues of law presented here are limited to duty, not causation of injury. Appellants first contend Respondent was operating as a "health studio" in this instance and pursuant to section 104113, it came under specialized statutorily owed duties regarding not only the acquisition, but also the actual supply and application of AEDs. The trial court's ruling included a footnote in which the court accepted, for purposes of analysis, that Respondent "appears to be a 'health studio' as defined by section 104113[, subdivision] (h)." To the extent this comment amounts to a

---

4       For purposes of section 104113, its subdivision (h) defines "health studio" as "a facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, body building, reducing, figure development, fitness training, or any other similar purpose, *on a membership basis*. 'Health studio' does not include a hotel or similar business that offers fitness facilities to its registered guests for a fee or as part of the hotel charges." (Italics added.) Section 104113, subdivision (f) provides immunities for use or attempted use of an AED, provided that no gross negligence or "willful or wanton misconduct" is proven in those respects.

5

legal conclusion about the nature and extent of Respondent's activities with respect to Appellants, we disagree. Certainly, the record supports a conclusion that in some aspects of its activities, Respondent acts in the capacity of a health studio toward its membership, but in this case, it was renting a field to a nonmember league that did not choose to accept its membership and regulatory policies, and it did not bring itself within the statutory definitions applicable to health studios that are required to supply AEDs to ensure the safety of its members. Appellants do not show that as a matter of law, Respondent's rental of its field was carried out in such a way as to impose a health studio's statutory AED installation and training duties upon it.

Next, for purposes of the more generic statutory requirements applicable to business owners, in this instance operators of sports facilities, we examine the terms of section 1797.196 and Civil Code section 1714.21. We conclude that as a matter of law, they do not impose the form of duty proposed by Appellants, to have a facility operator's employee apply and activate an AED at any location on the premises upon the occurrence of a medical emergency, even if the operator has acquired and made generally available such devices to promote the safety of its members and other patrons. The record does not support a conclusion that other duties exceeding the statutory requirements of section 1797.196 arose for the operator under these circumstances.

We next consider Appellants' alternative common law approaches for establishing specific duties that were owed under these circumstances. First, they argue Respondent undertook a specialized duty of care, applicable to its business patron Jabo, by making " 'manifestation[s] of responsibility to third parties,' " e.g. its members, that were

6

sufficient to give rise to its duty to have its personnel bring to the site and then apply an AED, in the event a medical emergency occurred. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 (*Artiglio*).) We cannot agree that the manner in which Respondent undertook its duties as an operator of sports facilities served to increase the risks of Jabo's participation in League games. (See *Knight v. Jewett* (1992) 3 Cal.4th 296, 316-317 (*Knight*) [facility owner has limited duty of due care not to increase a sports participant's risks over and above inherent risks of sport]; *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307, 335-336 (*Rotolo*) [disapprov. in other part in *Verdugo, supra,* 59 Cal.4th at p. 334, fn. 15].)[5]

In a further argument, Appellants present well-known common law duty factors concerning foreseeability and public policy considerations (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 (*Rowland*)), to argue that Respondent incurred a common law duty of reasonable care to patrons who become ill on its premises, to provide them with first aid

---

5    In large part, *Rotolo, supra,* 151 Cal.App.4th at pages 320 and 324 is still good authority with respect to the duties of an operator of a sports facility. (*Verdugo, supra,* 59 Cal.4th at pp. 328-329.) However, the court in *Verdugo, supra*, 59 Cal.4th at page 334, footnote 15 expressly disapproved one portion of that analysis, that declared the body of AED statutes is so detailed and comprehensive as to indicate the Legislature intended to "occupy the field" as to all regulation of AEDs. (*Rotolo*, *supra*, 151 Cal.App.4th at p. 314.) Rather, common law duty analysis is complementary to the statutory rules in this precise context, and may go beyond the statutes under a proper set of circumstances. (*Verdugo, supra,* at pp. 328-329 ["[*T*]*he Legislature*, by its enactment of Civil Code section 1714.21 and Health and Safety Code 1797.196, did not intend to impose such a duty [to acquire and install an AED] on building owners and managers" [i.e., the statutory duty is not coextensive with any common law source of duty].].)

7

assistance that includes its staff members' deployment and appropriate use of an AED.[6] In this closely regulated area that provides immunities to encourage the acquisition of AEDs to protect facilities and employees from liability in the event that they are used in an emergency, we cannot extend a common law duty, based on factors of public policy and foreseeability, to cover this category of circumstances, however unfortunate the result may be in one individual's case. (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772-774 (*Cabral*) [common law duty analysis speaks to category of allegedly negligent conduct, not a particular defendant's individual conduct]; *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*) [balancing of risks and burdens required for determining if alleged obligations should be imposed].)

Additionally, the enforceability of the release Jabo signed is still being argued on appeal, as an issue raised in both the amended complaint and the answer.[7] The trial court appropriately decided that the release document was unenforceable. We affirm the summary judgment.

---

[6] The complete list of duty considerations in *Rowland, supra*, 69 Cal.2d at page 113, includes "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

[7] Respondent initially cross-appealed the trial court's grant of summary judgment to Appellants on its cross-complaint, deeming the release to be unenforceable. Respondent then requested dismissal of its cross-appeal, which was granted. We have received supplemental briefing on the effect of that order of dismissal on the main appeal, and will discuss it in part II.B, *post*.

# I

## *BACKGROUND*

### A.  Sports League Rental Arrangement; Circumstances of Jabo's Death

In 2012, a group of Chaldean friends created the League, and requested that Respondent's program director Lynne Allen arrange for its regular rentals of a small, enclosed, locked "indoor" soccer field, which is actually located outdoors on its premises. The League explained to Allen that it did not want to comply with Respondent's policy that to qualify as one of Respondent's sponsored sports rentals, it must supply a list of its members and an updated game schedule.  The League also disagreed with Respondent's nondiscrimination policy that would not allow restrictions on League participation to over-40 Chaldeans.

After some negotiations, Respondent agreed to rent the field to the League on a private basis, for four successive 12-week seasons each year, for which Respondent's staff would provide limited weekly evening access, lighting, the use of soccer balls, and an employee scorekeeper.  For the next few years, the League paid Respondent $2,550 at the beginning of each 12-week season.  There were about 45 to 60 members of the League, who each paid it a quarterly season fee of about $75 to $90.  Only some of the League members also formally joined Respondent as members, as a separate transaction was required.  One of League's over-40 members, Kamal Sadiq, who spoke Arabic, was also a part-time employee of Respondent and was assigned as its employee scorekeeper for the games.

9

As part of the rental agreement, the League undertook to have its members sign liability releases, in a form provided by Respondent, in return for access to the facilities and equipment. This "facility waiver form" acknowledged that the signer understood the refund and transfer policies. Jabo did not know much English, and he signed a portion of the release after Sadiq explained it to him in Arabic and indicated where he should sign, which was in the section releasing liability for any injuries to his minor children, except for gross negligence or willful misconduct. Jabo did not sign the portion of the form intended to obtain releases from adults.

On the evening of July 12, 2016, the League had final games scheduled. Sadiq clocked into work, opened the field and supplied two soccer balls, an electronic scorekeeping device, and a first aid kit. He was under the impression that because the League was a private renter of the field, its games were not official YMCA events placed on the AED checkout schedule, and thus he was not required to check out one of the five AEDs owned by the facility. Sadiq had not yet been trained in AED use, although he had been working part time for Respondent about two years and had brought one to youth soccer games that he was assigned to referee.

Before the 7:30 p.m. game started, Jabo was playing soccer with other League members and was doing well. Between games, Sadiq went to the restroom. Jabo finished playing and went over to the bleachers. Suddenly, he collapsed and hit his head on a bleacher bench. League members immediately started helping him and at 7:23 p.m., one of them called 911 to report that he had apparently had a stroke. Jabo was

10

unresponsive and turning blue. Another member began cardiopulmonary resuscitation (CPR), as instructed by the 911 operator.

When Sadiq came out of the restroom, he found a chaotic situation of a League member performing CPR on Jabo, while another one was on the phone with 911 and a lot of yelling and praying was going on. A League member witness remembered that Sadiq was "in the mix" of people trying to help. Sadiq heard that an ambulance had been called and ran to the parking lot to direct it to the right area, as there were multiple points of access to the field. Sadiq was shocked and not thinking straight, and did not call the front desk to report what was happening, even though the facility's emergency procedures required him to do so. A qualified staff member with access to an AED was stationed at the front desk at the time.

Six minutes after the 911 call, paramedics arrived and attempted to resuscitate Jabo. He died at a hospital emergency room shortly thereafter.[8]

### B. Litigation and Ruling

Appellants filed their complaint on September 13, 2016 and obtained preferential trial setting because one of the sons is a minor. As relevant here, the pleading describes

---

[8]    Appellants' separate statement listed as additional disputed facts that Jabo had a pre-existing heart condition, including the installation of stents, but his doctor encouraged him to exercise and thus he likely would have survived if he had received proper emergency care from Respondent's employee. These allegations were hotly disputed by Respondent. They pertain to causation of injury and we need not discuss them, since only the legal issue of duty is before us. We also note that the duty analysis here relates to allegations about the two related rescue functions, performing CPR in connection with supplying an available AED for use. (*Verdugo, supra*, 59 Cal.4th at p. 320, fn. 3 [CPR is a critical component of a successful AED program].)

11

the League's rental of the enclosed soccer field, and the arrangement for Respondent to supply a scorekeeper. Appellants incorporated into their pleading allegations about the terms of Respondent's various guidelines for the use of its AEDs, as tools that can significantly increase the survival rate of adult cardiac arrest victims.[9] Appellants refer to Respondent's administrative manual and its 2012 medical advisory committee recommendations to allege that it knew about the importance of emergency procedures and use of AEDs to increase survival rates, in part because users of the facility are likely to be "at greater risk due to vigorous exercises and the size of the physical spaces between the various facilities." For purposes of their gross negligence claim, they alleged Respondent recklessly abandoned those internal policies and procedures, thus giving a false impression that it was acting responsibly and in conformity with industry standards.

In particular, Appellants contend that although Sadiq understood he was supposed to bring an AED to youth soccer games that he was assigned to referee, he had not been trained in CPR or using an AED. As conceded by Respondent, Sadiq did not bring an AED to League games because he understood they were not YMCA events, and they had not been placed on the schedule for checking out such devices. The field was around 600 feet away from the front desk, where Respondent keeps an AED. Sadiq was the only employee at the soccer field, and did not have a back up for when he went to the restroom, which is when Jabo collapsed. Since Sadiq did not use an AED the day Jabo

---

[9]     Appellants' pleading refers to 2012 statistics from the American Heart Association that showed about 295,000 instances of sudden cardiac arrests occur outside of hospitals each year in this country, but only eight percent of these victims survive, although some 40 percent could potentially be saved with greater use of AEDs.

12

died, Appellants preemptively pled Respondent was not entitled to assert any kind of immunity for such "use," within the terms of section 104113, subdivision (d) (health studios) or other relevant emergency aid statutes.[10]

Respondent brought several demurrers and eventually answered the second amended complaint. Extensive discovery battles took place, and Respondent filed its summary judgment motion on the complaint. Appellants filed a cross-summary judgment motion on the cross-complaint to determine that the release was unenforceable, since it was signed in the wrong place. Extremely lengthy separate statements were submitted by both Appellants and Respondent, out of the 3,600 pages of documentation filed for the cross-motions. Each side lodged numerous exhibits about Respondent's safety policies and procedures, the release, and deposition excerpts from witnesses about the events of the day and the League rental arrangements. Declarations were submitted from Respondent's employees Sadiq and its program director Allen, and Appellants

---

[10] Where a health studio has complied with all administrative regulations under section 104113, subdivision (e) for the placement, training, registration and notifications about AEDs, subdivision (d) of that section provides the studio with immunity from liability for damages resulting from an employee's act or omission in the course of rendering emergency care or treatment with the AED. Pursuant to section 1797.196, subdivision (f), other types of businesses are not required to acquire an AED to promote public safety. (See Civ. Code, § 1714.21, subd. (b) [immunity for a person's good faith use of an AED]; subd. (d)(1) [immunity from liability for an entity "resulting from any acts or omissions in the rendering of the emergency care by use of an AED if that person or entity has complied with subdivision (b) of Section 1797.196," the installation and maintenance requirements].)

13

supplied declarations from their expert consultants in the field of safety procedures for sports facilities.[11]

Both motions were heard in June 2017. Appellants relied on a fitness expert's declaration to argue that triable issues of fact remained on whether Respondent was acting as a health studio, since it had purchased and maintained AEDs and created policies for training employees in their use. Respondent suggested to the court that it could resolve this case under existing law, without the need for an express determination on whether it qualifies as a health studio under section 104113, subdivision (h). (E.g., § 1797.196.) Appellants' request for a continuance for further discovery was denied. (Code Civ. Proc., § 437c, subd. (h).) The trial court granted Respondent's request to take judicial notice of legislative history materials for section 104113, pertaining to the obligation of health studios operating on a membership basis to provide AEDs.[12] (Evid. Code, § 452, subd. (c).)

---

[11] Appellants' fitness expert, Anthony Abbott, an exercise physiologist, stated in his declaration, "There is a high degree of foreseeability of sudden cardiac arrest at health studios, including YMCAs, that can be effectively remedied by adhering to the standards of practice for health clubs, including the use of an AED." Respondent's objection to this statement was overruled but its other objections to his views were sustained (e.g., that Respondent's "failure to create an AED policy for its entire facility was problematic"; or that its conduct was an "extreme departure from the ordinary standard of care" applicable when a YMCA "permit[s] the use of their facilities and equipment to individuals or groups for physical exercise . . . or any other similar purpose, on a membership basis."

[12] Respondent has renewed and added to its request to take judicial notice of legislative history materials for section 104113, to include 2010 amendments. Appellants have not opposed the request and it was deferred to this panel. The request is granted, as will be discussed in part III. A, *post*. (*Home Depot U.S.A., Inc. v. Superior Court* (2010) 191 Cal.App.4th 210, 223, fn. 6.)

The trial court's lengthy order granting Respondent's motion explains the extensive procedural background, evidentiary objections and judicial notice requests, and applies the statutory scheme for AEDs to this set of facts. Although the briefs on appeal do not discuss the aspect of the trial court's ruling that excluded some evidence from one of Appellants' expert witnesses, Michael Spezzano, because of discovery abuse, the record shows that during his deposition, the parties tangled about whether Respondent qualifies as a health studio within the meaning of the statute. This witness, a former YMCA national health and fitness consultant, filed a clarification of his deposition testimony to say "I am not qualified (and was not retained) to opine on legal questions, such as whether the YMCA is a 'health studio' for purposes of the California Health and Safety Code. I will re-emphasize, however, that YMCAs offer many of the same services as traditional health clubs - as well as additional services." He also stated that in his view, "[Respondent's trial attorney] handled my deposition abusively; he failed to allow me to provide full and complete answers; and his intimidating tone and conduct caused me to become confused." "As a result, much of my testimony unfortunately must be corrected. In addition, due to the manner in which my deposition was conducted (as a cross examination instead of a discovery deposition), [defense counsel] was unable to elicit my full and complete opinions in this case." The ruling concluded, "With regard to the Spezzano deposition, the court agrees with plaintiffs and with the discovery referee that the entire original deposition is useless for any purpose, having been irretrievably tainted

15

by discovery abuse. The court imposes an evidentiary sanction."[13] However, Spezzano's declaration was considered.

For its conclusion that Respondent did not have a duty to use an AED under the requirements of section 104113, the ruling cited to evidence about the League's private rental arrangement for the soccer field and noted that Respondent "appears to be a health studio, as defined by section 104113, subdivision (h)." Ultimately, the court concluded that Respondent had no common law or other statutory duty to ensure that its staff member utilize an AED as alleged, such that the ordinary negligence cause of action was not sustainable. (§ 1797.196; Civ. Code, § 1714.21.) The gross negligence allegations were likewise not found to be substantiated, for lack of a showing of existing malice or conscious disregard of the rights of others.

On Appellants' cross-motion, the court ruled they were entitled to summary judgment on the cross-complaint for the reason that the release was invalidly executed, such that no properly instructed jury could find it was enforceable. (See fn. 7, *ante*; cross-appeal of the ruling disposing of the cross-complaint has been dismissed.) Appellants challenge the summary judgment on their complaint.

---

[13] In two separate rulings, the trial court sustained in part and overruled in part other evidentiary objections brought by each side. On appeal, the parties have not contested any of these evidentiary rulings, or explained their significance to the issues presented.

II

*APPLICABLE STANDARDS AND ISSUES PRESENTED*

A.  Review of Summary Judgment

To obtain summary judgment, a moving defendant must show that the plaintiffs' cause of action has no merit, e.g., that plaintiffs cannot establish one or more of the elements of their cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  The burden then shifts to the plaintiffs to show that there are existing triable issues of material fact as to the cause of action or a defense.  (*Ibid.*)

"On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law."  (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 464 (*Parsons*).)  The record is reviewed de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.  (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 334.)  The evidence is viewed in the light most favorable to the opposing party, by resolving any evidentiary doubts or ambiguities in its favor.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; see *Aguilar, supra,* 25 Cal.4th 826, 856 [opposing plaintiff's evidence construed for what it could show or imply to reasonable trier of fact].)

Independent review of a summary judgment is not limited to determining whether there is a triable issue of material fact justifying trial on the merits.  Appellants' negligence suit required proof of duty, breach, causation, and damages.  (*Conroy v.*

17

*Regents of University of California* (2009) 45 Cal.4th 1244, 1250.) Their theory of gross negligence is based on policy considerations "that harsher legal consequences should flow when negligence is aggravated instead of merely ordinary." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 776.) For either of these formulations of negligence, the question of whether a defendant owes the plaintiffs a duty of care is one of law to be decided by the court, and is amenable to resolution by summary judgment. (*Regents of University of California*, *supra*, 4 Cal.5th 607, 618.)

Interpretation and application of a statutory scheme to an established set of facts will be treated as questions of law which are subject to de novo review on appeal. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247; *Blue v. City of Los Angeles* (2006) 137 Cal.App.4th 1131, 1140.) This appellate court is not bound by the trial court's statutory interpretation. (*Ibid.*; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699.) Although the trial court set forth extensive legal reasoning in its written ruling, on de novo review of this record, its particular theory of decision is illuminating but not controlling. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19.)

### B.  Essential Issues for Decision; Release Not Enforceable

Before discussing the various formulations of duty argued here, we first seek to clarify that this record does not require us to decide this case on the basis of any binding effect of the release document that Jabo signed, which Appellants contend was invalid. The release referred to his signature as granting consideration for his children being permitted to participate in Respondent's programs, and to his agreement to its refund

18

policies. In its ruling addressing Appellants' cross-motion, the court determined that by its own clear terms, the release could apply only to minor children while they were participating in Respondent's activities or while on its premises. Respondent could not show that Jabo had agreed to the other terms below his signature, pertaining to adults, and all the cross-complaint's interrelated allegations about entitlement to contractual or other indemnification were unsubstantiated. Accordingly, the cross-complaint failed and was ordered dismissed. As already stated, Respondent requested that we dismiss its cross-appeal and it is no longer before us.

Respondent's brief nevertheless continues to argue the enforceability of the release, characterizing it as an issue encompassed by the complaint and various affirmative defenses in the answer. We have received reply, supplemental and surreply briefing on whether the grant of Respondent's motion to dismiss its appeal of the cross-complaint summary judgment has collateral estoppel or retraxit effect upon the issues resolved by the summary judgment, as to the complaint. (*Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319, 1331-1332 [dismissal with prejudice has finality for purposes of affirmative defenses, etc.].) Respondent takes the position that there was no binding ruling to disallow its current arguments that it was entitled to summary judgment, for reasons that include Jabo's execution of the release.

Collateral estoppel, or issue preclusion, "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue

19

actually litigated and determined in the first action," as long as it is asserted against a party to the first lawsuit or one in privity with a party. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) The party asserting such a defense bears the burden of establishing the requirements of these doctrines have been met. (*Basurto v. Imperial Irrigation District* (2012) 211 Cal.App.4th 866, 881.)

In their reply brief, Appellants contend that for purposes of interpreting their complaint, the terms of the release support a conclusion that Jabo, as a League member, effectively also became a member of Respondent and was fully entitled to all of its services. On the other hand, they continue to claim the release was ineffective for all purposes, and in their supplemental brief, they characterize the issue preclusion supplemental briefing as a "side-show" to the central and remaining legal issues on the existence of any or all duties owed to render emergency care to Jabo, "including with the use of an AED."

Suffice it to say that the summary judgment granted on the cross-complaint is not dispositive of the core issues presented by the amended complaint or the answer. We have been given no basis to conclude that the trial court's analysis of the unenforceability of the release was incorrect, and in any event, the record fully supports the cross-complaint ruling. Further, the determinations we make in the following discussion, regarding the lack of legal duties owed in this context and the absence of gross negligence, leave nothing to be effectively released. We decline to engage in the debate about any effect of the purported release document, and instead proceed to the

fundamental arguments concerning duty in its various iterations here, with respect to either ordinary or gross negligence.

## III

### *LIMITS ON IMPOSITION OF STATUTORY DUTIES*

The court's primary duty in interpreting a statute is to determine and effectuate legislative intent. (*Van Horn v. Watson* (2008) 45 Cal.4th 322, 326;[14] *Lennane v. Franchise Tax Board* (1994) 9 Cal.4th 263, 268.) This entails giving statutory language a commonsense meaning and construing it in the context of other provisions relating to the same subject matter, to harmonize them if possible. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.)

In this context of negligence causes of action, plaintiffs may go forward to address additional elements of breach, causation, and damage, only where the alleged duties have been established as a matter of law. Only at that point does the legal focus turn to the defendant's manner of exercise of reasonable care, under the given set of circumstances, and only then will questions of immunity from liability become determinative. (See *Hoyem v. Manhattan Beach City Sch. Dist*. (1978) 22 Cal.3d 508, 517 [statutory immunity evaporates upon a defendant's failure to exercise the reasonable care demanded by the statute].) Given this set of facts, we examine the statutory terminology to

---

14     As explained in *Verdugo*, *supra*, 59 Cal.4th 312, 327, *Van Horn v. Watson, supra,* 45 Cal.4th 322 has been superseded by statute to the extent its reading of certain statutory immunities for persons rendering emergency medical care was not extended to a good faith rescuer giving emergency nonmedical care. (§ 1799.102, subd. (a).) The framework for its duty analysis remains sound.

21

determine the scope of duties of care that are imposed by either the specific or the more general AED statutes, in relation to immunities afforded to acquirers of the devices, such as Respondent.

## A. Operators of Sports Facility: Section 104113

Appellants initially focus on section 104113, the specific statute relating to the particular obligations of health or fitness studios to acquire and maintain AEDs and to provide the necessary training for their personnel to use the devices in medical emergencies. Appellants claim that Jabo's signing of the waiver conferred membership status on him in some way, or alternatively, that he was a permitted user of a "health studio." Putting the proverbial cart before the horse, they declare, "Because the statute already requires health studios to acquire and maintain AEDs and train employees on their proper use [§ 104113(a))], it would not be unduly burdensome to recognize an additional common law duty to use AEDs when appropriate." They further argue Respondent failed to fully comply with the staff training requirements of section 104113, or its own policies and procedures, thus showing a conscious disregard for the safety of others that would disqualify it from obtaining immunity.

In pertinent part, section 104113, subdivision (h) defines a "health studio" as a "facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, . . . fitness training, or any other similar purpose, on a membership basis." (See fn. 4, *ante*.) Although a health studio is not a medical facility, the Legislature has determined that the nature of its business justifies such statutory requirements for specialized emergency precautions

22

involving the provision of AEDs on site. (*Verdugo, supra*, 59 Cal.4th at p. 324, fn. 8; § 104113, subd. (e) [administrative requirements for health studio's AED maintenance].)

The statutory term "health studio" does not readily connote a proprietor such as Respondent that provides rentals to nonmembers of outdoor playing fields, but appears to apply to some kind of facility that allows its members to use its recreational equipment. (See *Day v. Lupo Vine Street, L.P.* (2018) 22 Cal.App.5th 62, 68 (*Day*) [under § 104113, subd. (h), a landlord of a "health studio" was not tantamount to "studio," when it did not itself permit access to facilities on a membership basis].) Along those lines, Respondent requests, and we grant, judicial notice of legislative history materials for section 104113. These include a Senate Judiciary Committee staff bill analysis, stating the author intended the bill to apply to fitness centers and health studios that provide services and facilities to their membership clientele, but that "[t]he bill is not intended to apply to, for example, . . . private or public building owners that rent their facilities for recreational use by a third-party organization (such as the city or local high school renting out its tennis courts for use by a private tennis club)." (Assem. Bill No. 1507 (2005-2006 Reg. Sess.); *Home Depot U.S.A., Inc. v. Superior Court, supra,* 191 Cal.App.4th 210, 223, fn. 6 [judicial notice taken of portions of legislative history].)

It is not disputed that Respondent carries out many exercise-related activities on its indoor and outdoor premises, and in many of them, it presumably is acting toward its members as a "health studio" for purposes of the definition in section 104113, subdivision (h). It is also not disputed that Respondent acquired and installed five AEDs at the premises and enacted policies and procedures for training its personnel in their use,

such as checking them out at its scheduled or sponsored events. Under section 104113, subdivision (e)(2)(D), a health studio is required to train up to five staff members in the use of up to five AEDs, and additional personnel thereafter. Under section 104113, subdivision (e)(2)(E), a health studio is required to prepare an emergency plan describing the procedures to be followed. Respondent's activity in this respect was more extensive than would be required of an ordinary business under section 1797.196, subdivision (b). (See *Day*, *supra*, 22 Cal.App.5th 62, 68 [landlord leasing space to a "health studio" is not in a position to comply with requirements in § 104113 for servicing AEDS, etc.].)

Nevertheless, the briefs on appeal have not pointed to anything in this record clearly establishing that when Respondent acquired and maintained five AEDs, it was doing so as a health studio that had to comply with the statutory requirements of section 104113. In any event, the membership element of the statutory definition is absent from this case. (§ 104113, subd. (h).) The only relationship that Appellants can show most of the League members clearly had with Respondent was to sign the release form that Respondent required, to enable them to gain access to League events. Respondent's program director provided deposition testimony that it was "a private rental" for the League to use the field in return for a rental fee, and she negotiated a special agreement to provide limited services to the League, as an accommodation of the League's stated preferences to keep its arrangements informal and its membership exclusive, which were both contrary to Respondent's ordinary policies. For League rentals, Respondent simply assigned its staff member to open and lock up the field, supply balls and scorekeeping equipment, on site during weekly activities.

24

When medical emergencies arise at Respondent's premises, its administrative manual states in relevant part that "[d]ecisions as to the action required in each situation must be evaluated in light of the circumstances of the moment," and gives basic guidelines that first aid appropriate to the situation should be rendered and medical assistance obtained. According to the deposition of Robert Sauvajot, its vice-president, Respondent's policies are to supply emergency aid to members and nonmembers alike, should they have such a need on the premises. In renting the field to the League, the record does not support a conclusion that Respondent was undertaking to treat League events the same as Respondent's sponsored events. It also did not undertake to ensure that outside renters, such as the League, obtain and use their own AEDs.

As explained in *Verdugo*, *supra*, 59 Cal.4th 312, 342, legislative judgments made in the context of regulating AEDs are entitled to some deference, as that body is in "the best position to examine, evaluate and resolve the public policy considerations relevant to the duty question." Because the statutory definition of a health studio is specific in nature, to justify the imposition of fairly onerous additional duties concerning AEDs based upon the nature of the activities conducted there, we believe a narrow reading and application of section 104113 was intended by the Legislature. Even for institutions falling within its scope, section 104113, subdivision (b) grants immunity from liability for civil damages to health studio employees, for their use *or nonuse* of an AED for emergency care. Section 104113, subdivision (d) is intended to grant a health studio immunity for damages resulting from an employee's act or omission "in the course of rendering that emergency care," assuming the facility has complied with maintenance,

25

testing and training requirements. There are exceptions to the immunity provisions of section 104113, where gross negligence or willful or wanton misconduct is proven on the part of the person who used or maliciously failed to use the AED. (§ 104113, subd. (f).)[15] No such individualized malice is alleged here, only Respondent's allegedly inadequate adherence to its own safety policies and procedures.

When we focus on the undisputed record showing the fairly attenuated relationship between Respondent and the League, of which Jabo was a member, we cannot conclude as a matter of law that section 104113 operated to impose upon Respondent, as a provider of a facility with specified and limited staff services, all of the statutory duties of the owners and managers of a "health studio."

### B. Operators of Sports Facility: Section 1797.196

We next consider whether the precise statutory duties alleged, requiring individualized emergency usage and application of those AEDs that a sports facility operator has already made available to patrons, are consistent with legislative intent as found in section 1797.196, or as indicated by the AED immunity provisions of Civil Code section 1714.21. In examining the imposition of statutory duties, we are required to consider categories of allegedly negligent conduct, not a particular defendant's individual behavior. (*Cabral*, *supra*, 51 Cal.4th 764, 772-774.) As the owner and manager of a

---

[15]    Section 104113, subdivisions (e)(3) and (g) contain additional requirements that apply when health studios allow their members access to the facility during times when the facility does not have an employee on the premises. That was not shown to be the case here. The immunity provision of section 104113, subdivision (c) (for board members of a health studio) is not argued to apply here.

26

sports facility, Respondent is subject to a limited duty to use due care "not to increase the risks to a participant over and above those inherent in the sport." (*Knight*, *supra*, 3 Cal.4th 296, 316; *Rotolo, supra,* 151 Cal.App.4th 307, 315.)

In this context of AED regulation, it is appropriate to make distinctions between "(1) a business's common law duty to take precautionary steps prior to the time such an injury or illness has occurred in light of the foreseeability that such an injury or illness may occur, and (2) a business's common law duty to act to assist a patron from an ongoing threat to the patron's health and safety after the patron has experienced an injury or illness on the business's premises." (*Verdugo*, *supra*, 59 Cal.4th at p. 338; italics omitted.)[16]

Section 1797.196 was enacted to encourage the provision by businesses of AEDs for emergencies, but not to require their purchase (*id*., subd. (f); *Verdugo, supra,*

_____

[16]    Out-of-state cases involve different statutes and different bodies of common law, and are not particularly instructive in this context. (See 2 A.L.R.7th 5, "Liability Arising out of Availability or Use of Automated External Defibrillator or Other Defibrillator Device," collecting cases from a number of other courts on the potential liability of health, fitness, or sports clubs or facilities, as alleged by survivors of patrons who suffered cardiac arrest but who did not receive timely treatment at the facility. Such cases consider the existence of statutory or other duties to have, maintain, timely bring, or correctly use an AED on the patron prior to the arrival of emergency services. (E.g., *Miglino v. Bally Total Fitness of Greater New York, Inc*. (2013) 985 N.E.2d 128, 132-133 [statute seeking to ensure the availability of AEDs and trained users at health clubs did not go further to require actual usage]; *Trim v. YMCA* (Md.Ct.Spec.App. 2017) 165 A.3d 534, 543-544 [statewide program for public access to AEDs intended to encourage businesses to make devices available, but not to impose affirmative obligation of use]; see *Verdugo, supra,* 59 Cal.4th at pp. 342-343, fns. 23-28 [referencing other states' statutes and case law].)

59 Cal.4th at pp. 321-323; *Rotolo*, *supra*, 151 Cal.App.4th at pp. 323-324).[17]  The

Legislature has afforded immunity from potential civil liability arising in this factual

context, under specified circumstances.  (*Verdugo, supra,* at pp. 321-323; § 1797.196;

Civ. Code, § 1714.21.)

In this case, Respondent was making limited facilities available on a regular basis

for rental to the League, whose members were mainly not also members of Respondent.

Appellants do not plead a premises liability theory, since nothing was wrong with the

field and it is the level of emergency services provided that is in dispute.  The League

participants were all over the age of 40, and were presumably aware of their own health

restrictions and the risks of engaging in strenuous exercise, such as soccer.  (*Rotolo*,

*supra*, 151 Cal.App.4th at pp. 334, 337; see *Limones v. School Dist. of Lee County* (Fla.

2015) 161 So.3d 384, 392 ["a proprietor-customer relationship most frequently involves

two adult parties, whereas the school-student relationship usually involves a minor.

Furthermore, the business invitee freely enters into a commercial relationship with the

proprietor."].)  Respondent did not undertake a special relationship to safeguard the

---

[17]  The Legislature recently enacted section 19300, listing categories of businesses or schools that, if constructed and occupied *on or after January 1, 2017*, must have an AED on the premises.  (Stats. 2015, ch. 449, § 1.)  That provision is not applicable here, nor is Government Code section 8345 (as renumbered from the former Gov. Code § 8455 discussed in *Verdugo*), relating to the placement of AEDs in state-owned and state-leased buildings.  (See *Verdugo*, *supra*, 59 Cal.4th at pp. 324-325.)  Other regulations apply to medical facilities.  (*Ibid.,* fn. 10; § 1250 [definition of health facility]; § 1797.190 [training requirements for AEDs].)  Since *Verdugo* was issued in 2014, Education Code section 49417 was added for the provision of AEDs in school settings.  Other than those provisions and section 104113, "the Legislature has not imposed such a requirement on other types of business establishments."  (*Verdugo, supra*, at p. 342.)

health of the League members, but only to rent a field for their use, located a few minutes away from the front desk where an AED was kept. Respondent trained and educated many of its employees on AED use, and required a number of them to be present at the site during operating hours. Its part-time employee Sadiq did not receive such training until after Jabo died.

It is not disputed that Respondent sought to make an AED "accessible to anyone that might feel comfortable using [it]." Sadiq did not bring an AED to League games. He could have called the front desk, where an AED was located about 600 feet away. Even so, when a sports facility operator such as Respondent supplies AEDs on its premises, it does not become a comprehensive provider of emergency medical care. Appellants cannot show it was unlawful for Respondent to allow Sadiq to go to the restroom between games, thus leaving the field unattended, even though that was when Jabo collapsed. There was evidence that when Sadiq came upon the ongoing emergency, he ran to the parking lot to direct the ambulance to the field. There was no evidence of any complete failure to attempt to render aid, or of any wrongful intent to prevent it.

Section 1797.196 does not impose on acquirers of AEDs any requirement for universal training of all their employees, nor does it specify a mandatory supply of an AED or the actual use of the same, at every location and type of event that is held anywhere on premises such as Respondent operates, a large sports facility. "Nor can such duties reasonably be implied from the language of these statutes. And, in our view, imposition of such duties would not further the express legislative purpose to encourage widespread use of AEDs." (*Rotolo*, *supra*, 151 Cal.App.4th at p. 323.)

29

With regard to the malice exception, the trial court rejected Appellants' arguments that even assuming a duty to utilize an AED existed, there were potential exceptions to statutory immunities, by stating as follows, "There is no evidence that the YMCA and/or Sadiq knew of a substantial likelihood of the need to use an AED on July 12, 2016, yet with that knowledge intended not to use an AED. There is no evidence that the YMCA knew Sadiq had failed to use an AED in the past and would not use an AED on Mr. Jabo on July 12, 2016 due to malice. Plaintiffs only offer speculation and conjecture on malice." Respondent's employee ran for help and thus attempted to render some aid when the emergency arose. (*Verdugo*, *supra*, 59 Cal.4th at p. 338.) Appellants cannot properly invoke the exception to any applicable immunity from civil liability under Civil Code section 1714.21, subdivision (e) (exception from immunity where rescuer acted with gross negligence or willful misconduct). The trial court correctly concluded that in connection with the League's activities, the general AED statute, section 1797.196, did not impose upon Respondent further statutory duties to ensure that its employee applied and activated an AED at the field that day.

IV

*NEGLIGENT UNDERTAKING DOCTRINE*

A. Contentions and Ruling

Appellants' fundamental claim in this respect is that Respondent, in undertaking to acquire AEDs and train its staff in their deployment and use, made representations that were unsubstantiated, about how Respondent was providing a safe and protected facility for sporting events, both as to its members or to other users of the property such as Jabo.

30

(*Artiglio*, *supra*, 18 Cal.4th 604, 612.) They argue Respondent's actions or inactions gave rise to an assumed duty of care, that was negligently undertaken, thus increasing the inherent risks of the sport. (See *Breaux v. Gino's, Inc*. (1984) 153 Cal.App.3d 379, 382 [traditional tort analysis allows liability for nonfeasance as well as misfeasance; however, statute established that restaurant's legal duty to patron in distress was limited to timely summoning medical assistance]; *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 559 [triable issues of fact as to gross negligence existed when defendant actively increased risks of injury by knowingly setting up sports equipment in dangerous manner]; *Chavez v. 24 Hour Fitness USA, Inc.* (2015) 238 Cal.App.4th 632, 642 [fitness club's failure to perform regular preventative maintenance on equipment raised triable issues of fact as to gross negligence].)

The trial court determined that no duty had been incurred pursuant to a negligent undertaking theory. Although Respondent's employee Sadiq had undertaken to assist getting the ambulance and paramedics to the specific location, "[he] had no additional duty to go further and apply the AED or perform CPR. No case law is cited by plaintiffs to support such an additional duty."

The ruling also stated Appellants were unable to show "that the assistance provided by Sadiq contributed or increased the risk of harm to Mr. Jabo or that Mr. Jabo reasonably relied on the undertaking to his detriment." The presumed special relationship between a business and its patrons did not require Respondent "to apply lifesaving efforts in the absence of having provided an unsafe facility (and there is no evidence suggesting the soccer field was in any way defective)." Likewise, the court concluded that

31

Respondent's rules and policies that normally required an AED to be brought out to soccer fields for games did not create a legal obligation to utilize one, absent any evidence of reliance by Jabo as a League participant. The court reasoned that the League's preferences not to inform Respondent of its updated schedule operated to hinder Respondent's ability to follow its policies and procedures for bringing an AED to the soccer field. The expert declarations supplied by Appellants did not support their assertions of duty, since the exercise physiologist Abbott did not show any qualifications to render an opinion based on California law, statute, or practices on the use of an AED in California. Spezzano, the former YMCA national health and fitness consultant, declared that he is "not qualified to testify as to the 'legal requirements' for the use of AED's, and I have no opinion on that issue."

## B. Extent to which Duty was Assumed

Appellants' negligent undertaking theory of liability "subsumes" all the basic elements of a negligence action, including duty, breach of duty, proximate cause, and damages. (*Paz v. State of California* (2000) 22 Cal.4th 550, 559 (*Paz*); *Artiglio, supra*, 18 Cal.4th at p. 614.) "[A] negligent undertaking claim of liability to third parties requires evidence that: (1) the actor . . . undertook, gratuitously or for consideration, to render services to another . . . ; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons . . . ; (3) the actor failed to exercise reasonable care in the performance of its undertaking; (4) the failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the undertaking was to

32

perform a duty owed by the other to the third persons, or (c) the harm was suffered because of the reliance of the other or the third persons upon the undertaking." (*Id.* at pp. 613-614.)

The negligent undertaking doctrine incorporates the general rule, and exception, that one who did not create a peril "is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act. [Citation.] However, one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Paz*, *supra*, 22 Cal.4th at pp. 558-559; *Rotolo*, *supra*, 151 Cal.App.4th 307, 326 ["negligent undertaking" doctrine is an exception to general rule that one has no duty to protect another].)

Stated another way, the "Good Samaritan" rule is an outgrowth of the common law of negligence. (*Artiglio*, *supra*, 18 Cal.4th 604, 613.) Civil Code section 1714.21 is one such immunity statute that represents a legislative judgment that restricts liability, under specified circumstances, for an entity that takes precautionary measures by obtaining AEDs and having its employees or others provide emergency treatment with them. The foundation for considering whether an actor, such as a rescuer, should be exposed to liability on this theory is whether the actor made a specific undertaking " 'to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully.' " (*Artiglio*, *supra*, at pp. 614-615.)

33

In this context of rendering emergency aid, it is a legal question for the court whether the defendant's alleged actions, if proven, would constitute an "undertaking" sufficient to give rise to an actionable duty of care. (*Artiglio, supra*, 18 Cal.4th at p. 614.) Although the nature and extent of an alleged duty is a question of law, the courts must ascertain if factual issues exist about precisely what it was that the defendant undertook to do. (*Id*. at p. 615.) For example, in *Lichtman v. Siemens Industry Inc*. (2017) 16 Cal.App.5th 914, the court reversed the grant of summary judgment to a defendant that had contracted with a city to provide services to keep a traffic light battery backup system operable. In part, the court found the evidence raised inferences that the manner in which the defendant performed its contractual duties served to increase the risk of harm to third persons, in the event of a power outage, and the city had detrimentally relied on the battery backup system to promote public safety. The injured plaintiff (motorist hit in intersection) could properly invoke a negligent undertaking theory of duty against the contractor. (*Id.* at p. 929; see *Mukthar v. Latin American Security Service* (2006) 139 Cal.App.4th 284, 287, 291-293 [reversing grant of defense summary judgment and allowing injured store employee plaintiff to proceed on negligent undertaking theory of duty against security service that had failed to prevent harm for which it was hired, assault at the store; "it is a reasonable inference that the presence of an armed guard in close proximity to [plaintiff] would have prevented the assault"; unclear if trier of fact would actually draw that inference, however].)

In this case, the risk to Jabo was not external to him, such as a third party contractor would present, but was physically inherent in the strenuous sport he was

34

playing.  Respondent sought to make an AED "accessible to anyone that might feel comfortable using [it]."  Respondent obtained and maintained five AEDs, and adopted AED-related policies and procedures.  It provided training to employees in the use of AEDs, and required them to bring an AED when staffing "an outdoor clinic, practice, class, game, or rental."  The soccer field was a few minutes' walk away from the front desk, which had an AED, and away from any trained users of AEDs at the time.  Statistics showed that not every application of an AED in such a medical emergency would succeed, however.  (See fn. 9, *ante*.)

This record does not support a finding that Respondent's enactment and implementation of AED rules and policies was " 'an undertaking of such breadth and magnitude as to create a duty' " on its part to ensure the safety of all adult users of the soccer field at all times it was in use, by providing and applying an AED at the site of each such medical emergency. (*Artiglio, supra*, 18 Cal.4th at p. 617.)  We cannot accept Appellants' supposition that Respondent's employee's failure to use an AED on Jabo increased the risk of his death from sudden cardiac arrest, which was instead a risk inherent in his sport.  When Respondent acquired its AEDs and trained most of its employees to access and use them, it did not somehow increase any risks of harm to those sports participants using its facilities, who might become vulnerable to sudden cardiac arrest. (*Paz, supra*, 22 Cal.4th at p. 560; *Rotolo, supra*, 151 Cal.App.4th at pp. 335-336.)

Also, Appellants could not show Jabo or other League members who used the premises relied, to their detriment, on Respondent's undertaking to acquire a number of AEDs and train employees accordingly.  Appellants have no support for the claim that

35

Sadiq's failure to use an AED was a substantial factor in causing Jabo's death.  Summary judgment was appropriately granted on this theory.

V

*COMMON LAW DUTY QUESTION*

A.  Framework for Analysis

Appellants next argue for the imposition of a general duty of care to widely distribute and utilize AEDs that a sports facility, such as Respondent, has already acquired and made available on its premises.  Their argument is based on the traditional duty analysis factors set out in *Rowland*, *supra*, 69 Cal.2d 108 concerning foreseeability and public policy concerns.  The existence and scope of a property owner's duty to protect visitors against hazards is a question of law for the court to resolve on a case-by-case basis.  (*Parsons, supra,* 15 Cal.4th at p. 472.)  The existence of " ' "[d]uty" is not an immutable fact of nature " 'but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' " (*Ibid.*)  We evaluate the specific actions a plaintiff claims the defendant had a duty to perform in a given case, to undertake a balancing of the risks and burdens and to determine whether those obligations should be imposed, as requested.  (*Castaneda, supra*, 41 Cal.4th at p. 1214.)

In *Verdugo*, *supra*, 59 Cal.4th at page 338, the court analyzed issues about a retailer's common law duty to take reasonable steps to protect the health of customers on its premises, and distinguished between duties (1) to take precautionary steps to prepare to handle foreseeable injuries or illnesses, and (2) to take action and assist patrons

36

observed to be ill or injured there.  Here, it is not disputed that Respondent took some such precautionary steps by providing AEDs, but Appellants argue they were insufficiently widely deployed or used, and therefore Respondent failed to adequately carry out its common law duties for assisting Jabo when he became ill.  *Verdugo* established that the existence of AED statutes is not incompatible with the obligation of the courts to examine the scope of common law duties of care, particularly because a business establishment can qualify for statutory immunities, where the business has complied with AED requirements set forth by statute.  (*Id.* at pp. 330-333.)

We examine the claim of a common law duty with reference to the factors *Rowland* identified, which fall into two categories.  "The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant.  The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability.  The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief."  (*Regents of University of California*, *supra*, 4 Cal.5th 607, 629; *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 (*Kesner*).)

It is necessary to evaluate these basic *Rowland* factors (*Rowland*, *supra*, 69 Cal.2d 108), foreseeability and public policy, " 'at a relatively broad level of factual generality.' " (*Regents of University of California*, *supra*, 4 Cal.5th 607, 628; *Cabral*, *supra*, 51 Cal.4th at p. 772.)  "In considering them, we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by

37

clear considerations of policy.' [Citation.] In other words, the duty analysis is categorical, not case-specific." (*Regents of University of California*, *supra*, at p. 629.)

### B. Trial Court's Ruling: No Common Law Duty

In its ruling, the trial court first acknowledged the general rule that persons who have not created a peril are not liable in tort " 'merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' " It continued, "This statement of law supports the absence of a common law duty owed by the YMCA to use an AED or perform CPR on Mr. Jabo. [¶] . . . [¶] Further, in balancing the *Rowland v. Christian* factors, there is no common law duty to apply an AED or perform CPR on Mr. Jabo. [¶] In this respect, plaintiffs contend that there is a high risk of sudden cardiac arrest at facilities like the YMCA that may be effectively remedied by the use of an AED. [Citation.] However, the Legislature (which although it has not occupied the field has certainly been very active in it) has not mandated a duty to use an AED [citing to §§ 1797.196 and 104113; Civ. Code § 1714.21]. . . . The Legislature has had ample opportunities to make clear its intent to require the use of an AED. It has not done so."

The trial court next considered as factors the foreseeability of harm, and the closeness in connection between the conduct alleged and the harm, and ruled they did not favor the imposition of a common law duty under these circumstances. The duty of due care imposed on the operator of a sports facility has limitations, requiring it to refrain from increasing risks to a participant over and above those inherent in the sport. (*Knight, supra*, 3 Cal.4th at pp. 315-316.) As a business proprietor, it must summon aid to assist a

38

patron experiencing a medical emergency, but the fact that there may be a high risk of sudden cardiac arrest that could be remedied through the use of an AED does not itself support the imposition of a duty to utilize one. (*Rotolo*, *supra*, 151 Cal.App.4th at pp. 336-338.)

With respect to factors of public policy, the trial court declined to find that there was a level of culpability on the part of Respondent sufficient to find it to be morally blameworthy: "There is no evidence that the YMCA intended, planned, or acquiesced in the incident. There is no evidence that the YMCA had subjective or objective bad faith, or engaged in inherently wrongful acts."

The ruling further stated it would be counterproductive to impose a duty to use an AED, because it could discourage proprietors from obtaining them, if they would then be penalized for breaches of duty occurring from their employees' failure to actually utilize them. The court concluded, "Imposing a duty to use an AED could create a cottage industry of litigation against businesses, schools, and premises that acquire and maintain AEDs. This could make participation in soccer games, other sport games, and sports leagues in California unaffordable or unavailable. [¶] Finding a common law duty to use an AED will probably increase the cost of insurance. Insurance will undoubtedly become more expensive and less available if liability is expanded. [¶] Essentially, the *Rowland v. Christian* factors mandate that there is no common law duty for the YMCA to apply an AED or perform CPR."

39

## C. Duty Formulation:  Foreseeability Factors

A court's task in determining duty " 'is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .' " (*Cabral*, *supra*, 51 Cal.4th 764, 772; italics omitted.)

"A duty 'to acquire and make available' an AED must reasonably be understood to entail a variety of related obligations, including proper maintenance of the AED, AED and CPR training and practice, and staffing of trained personnel." (*Verdugo*, *supra*, 59 Cal.4th at p. 336, fn. 18.)  When acting as a sports facility operator, Respondent had a special relationship with its invitees who might suffer a medical emergency, requiring it to summon emergency services. (*Rotolo*, *supra*, 151 Cal.App.4th at p. 333.)  The persons who participated in sports on its premises were deemed to have primarily assumed the risk of injuries of the types ordinarily incurred in playing the sport. (*Knight, supra*, 3 Cal.4th at pp. 315-316; *Rotolo, supra,* at p. 333.)  Comparative fault principles then place upon the sports facility operator an additional duty of care, to avoid increasing those risks that are inherent in the sport (doctrine of secondary assumption of risk; *Knight, supra*, at pp. 315-316).  For example, owners or operators of a sports facility must not design or maintain a facility "in such a way as to unreasonably increase the risks inherent in the sport." (*Rotolo*, *supra*, at p. 334.)  However, they are not subject to a heightened duty of care to protect invitees, such as a school district or common carrier would have had.  (*Id*. at p. 330.)

40

Appellants claim Respondent had a precautionary duty to ensure that all of its employees received adequate training about the facility's emergency plan, specifically, their obligation to check out and bring the AEDs that are provided to locations where sports were being performed on the premises. This would also entail Respondent's duty to supervise its employees to ensure that they followed the policy to disperse AEDs throughout the property where such activities were taking place. (See *Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 595 [jury verdict for plaintiff affirmed because business proprietor owed a duty to use reasonable care to secure restrooms for patrons, by providing security guard in the area, due to foreseeability of assault there and deterrent effect; "having elected to employ multiple security guards and station them in the restroom area, [proprietor] assumed a duty of reasonable care with regard to the security guards' deployment"; substantial evidence existed of breach of duty and causation].)

Appellants further argue Respondent had a common law duty to better prepare its employees to render adequate emergency assistance, by conducting drills and education that would ensure that employees could and would actively use an AED in a medical emergency, in a competent manner. Such a duty would impliedly require Respondent to provide not only one fully trained and equipped staff member per event, but also a substitute who would be available to persons on the premises to render such assistance, within minutes of encountering an emergency. To evaluate these claims, we observe that the League was formed to offer sports opportunities to certain community members who were over the age of 40, and Respondent agreed to facilitate its activities. It is not

41

disputed that a League member might foreseeably suffer adverse medical consequences from engaging in the strenuous sport of soccer. (*Rotolo*, *supra*, 151 Cal.App.4th at pp. 334, 337.)

Appellants contend that this sports facility operator could readily foresee that participants might suffer this type of medical emergency and be harmed, upon a failure of the facility's employees to provide the type of medical assistance needed. The duties Appellants are proposing are analogous to the common law duty formulation that was rejected in *Rotolo*. Those family members (parents of a teenager who died in 2004 of sudden cardiac arrest while playing ice hockey) sought to impose on the building owner a duty to give notice to building users of the existence or location of those AEDs that the owner had already voluntarily installed. (*Rotolo, supra,* 151 Cal.App.4th at p. 339.) The court found no support for finding or implying such an additional duty of notice within the applicable AED statutes, and stated that to imply or create such a notification duty would not "further the legislative purpose of promoting the acquisition of these life-saving devices." (*Ibid.*)[18]

We agree with the trial court that merely because it is foreseeable that sports participants may be vulnerable to sudden cardiac arrest, there is no principled basis to

---

[18]    The Legislature recently amended section 1797.196, subdivisions (b) and (c) to expand the notification measures that must be taken by building owners that have provided AEDs, and by schools that have done so, toward their tenants and school employees. (Stats. 2015, ch. 264, § 2; see fn. 17, *ante*, regarding recent statutory amendments.) However, the statements in *Rotolo*, *supra*, 151 Cal.App.4th 312, 324, about the lack of common law duties to notify other incidental users of property about the existence and location of installed AEDs do not appear to be affected by those amendments.

determine that additional duties, beyond those required by statute, exist for a sports facility operator to compel its employees to utilize and apply those AEDs provided on the premises, on pain of liability. This duty analysis is categorical, not case specific, and statutory guidelines are relevant and instructive in this policy-based common law analysis. (*Kesner, supra,* 1 Cal.5th at p. 1144; *Verdugo*, *supra*, 59 Cal.4th at pp. 334-335.) The language of section 1797.196 and Civil Code section 1714.21 reflects that the Legislature included considerations of duty and notice in this context. (*Rotolo*, *supra*, 151 Cal.App.4th at p. 324.) The applicable statutes do not expressly or impliedly impose a duty on any individual employee to utilize an AED that has been made generally available by the employer as a precaution against emergency situations, and do not indicate that a common law extension of such a duty is appropriate.

Further, the foreseeability factors from *Rowland, supra*, 69 Cal.2d 108 do not establish the necessary close connection between Respondent's conduct and the (most regrettable) death of Jabo. "Even assuming, however, that respondents possessed a general knowledge that athletes may succumb to sudden cardiac arrest during strenuous activities, they could not have prevented such an occurrence, which is a risk assumed by those playing the sport. There is therefore no close connection between anything respondents did or did not do and the injury suffered by [the athlete] that led to his death. The fact that statistically the chances of surviving an incident of cardiac arrest are increased by the timely use of a defibrillator, even if this knowledge is imputed to respondents, does not give rise to a duty on respondents' part to take affirmative steps to ensure that the device will be used in appropriate circumstances, particularly considering

43

that the Legislature expressly has found no duty to acquire or install an AED in the first place." (*Rotolo*, *supra*, 151 Cal.App.4th at p. 337.)

## D.  Public Policy

Even if the foreseeability factors of *Rowland, supra,* 69 Cal.2d 108 weigh in favor of recognizing a duty of care, the courts "must also consider whether public policy requires a different result." (*Regents of University of California*, *supra*, 4 Cal.5th 607, 631; *Kesner, supra*, 1 Cal.5th at pp. 1149-1150; *Cabral, supra*, 51 Cal.4th at p. 781 [public policy factors include moral blame of defendant's conduct, policy to prevent future harm, extent of burden on defendant, community concerns about imposing duty of care with resulting liability for breach, and insurance availability for identified risk].)  "A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability." (*Regents of University of California*, *supra*, at p. 631.)

In *Verdugo*, the court identified as factors to be considered in imposing specific AED obligations such items as "the nature of a business's activities, the relationship of those activities to the risk that a patron may suffer sudden cardiac arrest, the proximity of the business to other emergency medical services, and other potentially relevant factors." (*Verdugo, supra,* 59 Cal.4th 312, 341.)  The court deemed those to be policy considerations "that appear especially appropriate for legislative inquiry and determination." (*Ibid*.)  Even assuming it is foreseeable that an identified danger will arise on a business's premises, it is essential to consider "the relative burden that

44

providing a particular precautionary measure will place upon the business." (*Id.* at p. 338.)

By facilitating the League's purposes, Respondent's rental arrangement had some community and social utility that is entitled to some consideration as a balancing factor, which we think supports limiting the extent of the burden of duty to be imposed. (*Regents of University of California*, *supra*, 4 Cal.5th at p. 631; *Castaneda*, *supra*, 41 Cal.4th at p. 1214.) Public policy concerns are relevant as to the extent of the burden to be placed through a duty to require more complete deployment of AEDs around the premises, and a consequent duty to ensure their mandatory usage by employees.

In considering the extent of common law duties to be imposed on an acquirer of an AED, the provisions of section 1797.196, subdivision (f) are relevant here, providing, "Nothing in this section or Section 1714.21 of the Civil Code may be construed to require a building owner or a building manager to acquire and have installed an AED in any building." Once Respondent undertook to acquire and maintain AEDs, and to provide them at outdoor fields, its undertaking of that burden should not be penalized by requiring more stringent personnel practices that would treat its regular and part-time employees effectively like amateur paramedics in this context. "The goal of encouraging building owners to acquire and install AEDs, even though they have no duty to do so, would not be furthered if courts were to impose duties on building owners acquiring AEDs beyond those delineated in the statutes, thus creating uncertainty as to the scope of the immunity provided." (*Rotolo*, *supra*, 151 Cal.App.4th at p. 338.) "Under these circumstances, it is appropriate to leave to the Legislature the policy decision" on

45

whether a sports facility operator should be required to ensure that its employees actually utilize any AEDs it has acquired for the protection of its patrons in the event of a medical emergency.  (*Verdugo, supra,* 59 Cal.4th 312, 341; *Rotolo, supra,* at pp. 315-316.)

For all of these reasons, the trial court correctly declined to impose an additional common law duty of care requiring Respondent's employees to provide hands-on usage of an AED when a medical emergency occurs, on these undisputed facts involving a private rental of an outdoor facility and where Respondent had acquired AEDs and enacted internal policies for distributing them at various locations where authorized sports activities were taking place.

## DISPOSITION

Summary judgment is affirmed.  Each party to bear its own costs of appeal.


HUFFMAN, J.

I CONCUR:


McCONNELL, P. J.

46

AARON, J., Dissenting.

I agree with the majority that *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312 (*Verdugo*) provides the appropriate analytical framework for resolution of this appeal. However, I would conclude that that Respondent is clearly a health studio within the meaning of Health and Safety Code section 104113, subdivision (h), and that a proper application of *Verdugo* demonstrates that, in view of the statutory mandates applicable to health studios with respect to the acquisition of automatic external defibrillators (AEDs) and the training of health studio employees in the use of AEDs, such entities have a common law duty to reasonably use such devices in a medical emergency.

The majority states that it "evaluate[s] Appellants' challenge to the grant of summary judgment to Respondent in light of the analytical guidance provided by *Verdugo*." (Maj. opn., *ante*, at p. 5.) In applying *Verdugo*, the majority concludes that Respondent's common law duty of reasonable care to patrons who suffer injury or become ill on its premises to provide first aid assistance does not include a duty to use an AED to assist "an adult . . . having an on-site medical emergency that appears to be sudden cardiac arrest, while the adult is a permissive user of the facility whose group rented an outdoor portion of Respondent's sports facilities . . . ." (Maj. opn., *ante*, at pp. 2, 46.) In reaching this conclusion, the majority asserts that "there is no principled basis to determine that additional duties, beyond those required by statute, exist for a sports facility operator to compel its employees to utilize and apply those AEDs provided on the premises, on pain of liability." (Maj. opn., *ante*, at p. 43.)

In reaching this conclusion, the majority analyzes the issue as if the YMCA were not a health studio, but rather, merely a business that is open to the public. In this regard, the majority asserts that the parties "have not pointed to anything in this record clearly establishing that when Respondent acquired and maintained five AEDs, it was doing so as a health studio that had to comply with the statutory requirements of [Health and Safety Code] section 104113."[1] (Maj. opn., *ante*, at p. 24.) However, there can be no serious question that Respondent is a health studio within the meaning of section 104113, subdivision (h). That statutory provision defines a "health studio" as "a facility permitting the use of its facilities and equipment or access to its facilities and equipment, to individuals or groups for physical exercise, body building, reducing, figure development, fitness training, or any other similar purpose, on a membership basis." (§ 104113, subd. (h).) As the majority notes, "It is not disputed that Respondent carries out many exercise-related activities on its indoor and outdoor premises, and in many of them, it presumably is acting toward its members as a 'health studio' for purposes of the definition in section 104113, subdivision (h)." (Maj. opn., *ante*, at p. 23.) Yet, in its analysis of whether a common law duty exists on the part of Respondent to use an AED under the circumstances of this case, the majority entirely disregards the reality that the YMCA, in its day to day operations, is a health studio and that as such, it has statutory duties, as well as statutory immunities, with respect to the use of AEDs.

---

[1] Unless otherwise specified, all subsequent statutory references are to the Health and Safety Code.

2

As a health studio, Respondent has a statutory duty to "acquire, maintain, and train personnel in the use of, an automatic external defibrillator[ AED] . . . ," to have trained employees available to respond to an emergency that may involve the use of an [AED] unit during staffed operating hours, and to have a written plan describing the procedures to be followed in the event of an emergency that may involve the use of an AED. (§ 104113, subds. (a), (e)(2)(D), (E).)[2] These statutory duties must be taken into account in assessing whether Respondent's common law duty of reasonable care to its patrons includes a duty, in appropriate circumstances, to use an AED in the event of a medical emergency. (*Verdugo*, 59 Cal.4th at pp. 334–335.)

In *Verdugo*, the issue before the court was whether, under California law, the common law duty of reasonable care that the defendant, Target Corporation (Target) owed to its customers included an obligation to obtain and make available on its business

---

[2]    The record demonstrates that the YMCA clearly viewed itself as a health studio. As required by section 104113, the YMCA acquired and maintained five AEDs and trained its employees in their use. Further, the YMCA of the USA's Medical Advisory Committee Recommendations state that an "on-site emergency response plan is required that includes use of an AED for early defibrillation." In addition, Respondent's Administrative Manual states that "[b]ranches must update their emergency procedures to include the use of the AED," and that YMCA staff must activate the branch Emergency Procedures and provide prompt basic life support "including AED and first aid." The Administrative Manual further states that an AED "should be used on any person who is at least 1 years of age and displays ALL the symptoms of cardiac arrest," and goes on to state that the AED is to be used only after it is confirmed that the person is unconscious, not breathing, and has no pulse and shows no signs of circulation such as normal breathing, coughing or movement. Finally, the East County Family YMCA's Youth and Adult Sports Staff Manual (the facility involved in this case) provides that an "AED must be checked out every time we have an outdoor clinic, practice, class, game, or rental for both youth and adult sports," and that "[e]ach sports staff working outside the facility (i.e. on the softball field and soccer arena) is required to take a first aid kit and AED with them in the event of an emergency."

3

premises an AED for use in a medical emergency. The *Verdugo* court specifically recognized that although "*the [relevant] legislative enactment . . . was not intended, and may not be construed by California courts, to require a building owner or manager to acquire and install an AED in any building,* the subdivision in question [subdivision (f)] does not purport to address *the separate and distinct question* whether, and if so under what circumstances, California *common law* may embody a duty to acquire and make available an AED as part of the general common law duty of care owed by a business establishment to its patrons or customers." (*Verdugo*, 59 Cal.4th at p. 326, second italics added.)

In rejecting Target's argument that the enactment of Health and Safety Code section 1797.196, which provides that "[n]othing in this section or Section 1714 .21 of the Civil Code may be construed to require a building owner or a building manager to acquire and have installed an AED in any building," precluded recognition of a common law duty on the part of Target to provide an AED for use by its customers, the *Verdugo* court criticized an analogous assertion made by the Court of Appeal in *Breaux v. Gino's, Inc.* (1984) 153 Cal.App.3d 379 (*Breaux*). In *Breaux*, the decedent, a customer at a restaurant owned and operated by respondent, choked while eating. An assistant manager called for an ambulance as soon as he became aware that the customer was in distress. No one attempted to administer first aid to the choking customer. It was undisputed that respondent had "complied with [then existing] Health and Safety Code section 28689 by posting in an appropriate place the state-approved first aid instructions for removal of food which may become stuck in a person's throat." (*Id.* at p. 381.) Observing that "[i]t

4

is well established that restaurants have a legal duty to come to the assistance of their customers who become ill or need medical attention and that they are liable if they fail to act," (*id.* at p. 382) the *Breaux* court addressed what physical acts restaurants and their personnel are required to perform. The court noted that in Health and Safety Code section 28689, the Legislature had established standards for restaurants' actions with respect to patrons who have food stuck in their throats, quoting the portion of the statute that stated that ". . . [n]othing in this section shall impose any obligation on any person to remove, assist in removing, or attempt to remove food which has become stuck in another person's throat." (*Ibid.*) The appellate court concluded that this statute established "as a matter of law that a restaurant meets its legal duty to a patron in distress when it summons medical assistance within a reasonable time, " and that the respondent had met its duty to the decedent by summoning an ambulance promptly. (*Ibid.*)

Noting that " ' "[t]here is a presumption that a statute does not, by implication, repeal the common law," ' " the *Verdugo* court rejected the *Breaux* court's assertion that the Legislature had resolved the question of the nature and extent of a restaurant's duty with respect to patrons who have food lodged in their throats through the then-existing language in Health and Safety Code section 28689. The *Verdugo* court stated,

> "[T]he fact that the statutory provision at issue in *Breaux* specified simply that nothing *in the statute* imposed an obligation to remove or attempt to remove food which has become lodged in a customer's throat was not itself sufficient, in our view, to preclude a court from determining whether, under generally applicable common law principles, such a duty should properly be recognized under the common law. The court in *Breaux* failed adequately to consider the common law as an alternative source of potential tort duty or

5

liability, distinct and independent of any statutorily imposed requirement."  (*Verdugo*, 59 Cal.4th at p. 331.)

The *Verdugo* court recognized that in addition to any *statutory* duty owed to its customers, a restaurant's *common law duty* of reasonable care might include, "either in general or in light of a special risk of choking that might be posed by particular foods or the frequency at which such choking may have occurred at the establishment, an obligation to take reasonable steps to attempt to dislodge an obstructing particle of food from a choking customer."  (*Verdugo*, 59 Cal.4th at p. 330.)

Just as a restaurant may, under appropriate circumstances, have a common law duty to attempt to dislodge food from the throat of a choking patron, a health club☐a type of establishment at which, as the Legislature has recognized, there is a heightened risk of a patron suffering sudden cardiac arrest☐may very well have a common law duty, in appropriate circumstances, to use an AED in a medical emergency.

The *Verdugo* court made clear that in determining whether a defendant has a *common law* duty to take some particular action with respect to AEDs, a court should carefully analyze the existing *statutory* framework to assess the relevant policy considerations that impact such a determination.  (*Verdugo*, *supra*, 59 Cal.4th at pp. 334–335 ["Although . . . we conclude that the current California statutes do not preclude courts from determining whether a common law duty to acquire and make available an AED (either in general or in particular circumstances) should be recognized, it should be emphasized that this does not mean that in considering whether such a common law duty should be recognized, courts should not take into account the existing California AED

6

statutes insofar as such statutes bear on the relevant policy considerations that affect that determination"].)  Existing California AED statutes require health studios to acquire AEDs and to train their employees in their use.  (§ 104113, subd. (a).)  The AED statutes also provide immunities for the use *or* non-use of AEDs in medical emergencies by health studio employees when the health studio is in compliance with the requirements of section 104113.  (§ 104113, subd. (d).)  These statutory provisions evince a clear legislative intent to strongly encourage the use of AEDs by health studio employees in the event of a medical emergency.

In determining the scope of the common law duty on the part of a business to provide reasonable aid to its patrons who suffer a medical emergency on its premises, a court must determine:  1) whether the risk of the particular medical event to be guarded against is *foreseeable* in light of the nature of the activities performed at the defendant's business; and 2) whether requiring a particular safety measure would be unduly *burdensome*.  (See *Verdugo*, *supra*, 59 Cal.4th at p. 338 [examining "(1) the degree of foreseeability that the danger will arise on the business's premises and (2) the relative burden that providing a particular precautionary measure will place upon the business"].)

In view of the nature of the activities engaged in by patrons of health studios, it is eminently foreseeable that a patron of such a facility may suffer sudden cardiac arrest while using the facilities of the club.  This foreseeable danger is plainly the reason why "[h]ealth studios are currently the *only* nonmedical setting in which California statutes or

regulations require that AEDs be provided." (*Verdugo*, *supra*, 59 Cal.4th at p. 324, italics added.)[3]

Given the statutory mandates applicable to health studios with respect to AEDs, establishing a common law duty for health studios to *use* an AED in a medical emergency involving cardiac arrest would impose a minimal incremental burden. In addition, the consequences to the community of imposing a duty to use an AED would be minimal since owners, managers, employees and "otherwise responsible authorities of the facility" are granted broad statutory immunity for the use *or* nonuse of an AED to render emergency care or treatment, as long as the facility is in compliance with other provisions of section 104113. (§ 104113, subd. (d).) Thus, imposing a common law duty on health studios to *use* an AED in a medical emergency would constitute a *minimal burden* to guard against this *highly foreseeable* risk.

I would conclude that a proper application of *Verdugo* establishes that as part of its duty to take reasonable action to protect or aid patrons who sustain an injury or suffer an illness while on the business's premises, Respondent, as a health studio, has a duty to deploy and use an AED on a permissive user of its facilities, in appropriate

---

3    The majority effectively concedes that there is a higher risk of sudden cardiac arrest to participants in sports or exercise activities at a health studio than to members of the public in general, stating that even if the foreseeability factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113, weigh in favor of a duty of care in this case, courts " 'must also consider whether public policy requires a different result.' " (Maj. opn., *ante*, at p. 44, quoting *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 631.)

circumstances, in the event of a medical emergency.  I would therefore reverse the grant of summary judgment.


AARON, J.